**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Eugene J. CAHILL, Sr., Defendant–Appellant.**

**No. 89–1208.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 8, 1990.

Decided Dec. 10, 1990.

Thomas M. Durkin, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Stephen E. Tinkler, Denver, Colo., for defendant-appellant.

Before POSNER, RIPPLE, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Eugene J. Cahill, Sr., the president and primary shareholder of Reliance Mortgage Company ("RMC"), and his purported co-conspirators, Donald Ceaser and William Powers, both officers of First Financial Savings & Loan of Downer's Grove, Illinois ("First Financial"), were charged with crimes involving three interrelated schemes to defraud First Financial. The thirty counts against Cahill involved allegations

of mail fraud, wire fraud, interstate transportation of money obtained by fraud, false statements to the government, aiding and abetting bank officers in numerous bank misapplications, as well as racketeering. Through the alleged schemes, Cahill's mortgage company, RMC, obtained the use of $13.4 million of First Financial funds, while Powers and Ceaser procured $2.8 million of the thrift's money for their personal use and benefit.

The underlying facts of this case came to light as a result of the April, 1982 collapse of First Financial Savings & Loan, a thrift institution insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"). In the aftermath of the collapse, federal regulators took over First Financial and Gerald Chapman, Deputy Chief of the Enforcement Section of the Federal Home Loan Bank Board ("FHLBB"), initiated an inquiry into the causes of the thrift institution's failure. During the investigation, the banking examiners scrutinized the relationship between First Financial and one of its institutional customers—RMC, the Colorado mortgage-banking firm headed by Cahill.

In the fall of 1982, Chapman met with Cahill and reached an agreement which provided the FHLBB with open access to RMC's offices, files, and employees. Soon after, Chapman, Jack Troia, the FHLBB accountant, and John Conlon, a lawyer representing the FSLIC, reviewed RMC's records and discussed them with Cahill. Noting some irregularities, on January 17, 1983, Chapman sent a criminal referral letter to the United States Attorney's office in Chicago, Illinois. In the letter, Chapman concluded that Powers and Ceaser had committed criminal acts—but only suggested that Cahill also might have violated the law. As a result of the letter, Assistant United States Attorney John H. Newman was assigned to the case. After learning of Chapman's investigation, Newman contacted and met with Chapman in mid-February.

On March 1, 1983, Chapman, on behalf of the FHLBB, took Cahill's deposition [the March 1, 1983 Statement] in order to aid Chapman in his efforts to obtain a "Removal and Prohibition Order" against Powers and Ceaser. At the time of the deposition, Chapman neither informed Cahill of the criminal referral letter nor advised him that his deposition testimony would be forwarded to the U.S. Attorney's office.

Later that month, Newman called Chapman to discuss the FHLBB investigation of First Financial. During the call, Newman stressed to Chapman that the U.S. Attorney's office's investigation would be "separate," that Newman would only receive information from Chapman, that Newman would not disclose any information to Chapman, that Chapman and Newman would be as "ships in the night," and that Chapman was "on his own." Newman followed up his phone call with a letter memorializing their conversation and restating the ground rules regarding the relationship between the FHLBB investigation and any criminal investigation by the U.S. Attorney's office. Accordingly, the letter confirmed that "any investigation which may be undertaken by this office or the grand jury, will be separate, distinct and independent" from the FHLBB investigation.

Over the next several months, Cahill continued to cooperate with Chapman, Troia, and Conlon. And, when a grand jury subpoena was issued for the production of RMC business records on July 21, 1983, Newman held discussions with Anthony Accetta, Cahill's attorney, regarding the production of those records. During their telephone conversation, Newman assured Accetta that Cahill was not presently a target or subject of the criminal investigation.

In early September of 1983, Cahill and Accetta met briefly with Roy Lane, an FBI agent. At the meeting, Cahill informed Lane that he would voluntarily provide a statement to the FBI [the September 7, 1983 Statement]. After the meeting Accetta again asked Newman about Cahill's status. Noting that he was just beginning the case, Newman stated that "as of now" Cahill was "not a subject of a criminal investigation" but noted that Cahill's status "could change."

Over the next year, the grand jury investigation into the collapse of First Financial continued. Throughout this period, Cahill continued to cooperate with the civil investigation. On October 2, 1984, Accetta again asked Newman if Cahill was a subject of the criminal investigation. Although Newman testified that, at that time, he still viewed Cahill as a witness and not a subject of the criminal investigation, Accetta testified that he had two contradictory conversations with Newman on the date in question. In the first telephone conversation, Accetta claimed that Newman maintained that Cahill was a subject of the original criminal investigation, but later called back to let him know that while Cahill was not a subject, there were "troubling things" about Cahill's previous statements that did not make sense.

On October 10, 1984, Newman had a day-long meeting with Troia and Conlon. After that meeting, Newman testified that the "world ... changed" concerning his view of Cahill and his role in the First Financial collapse. Subsequently, Newman sought to make arrangements to obtain RMC's records.

At the November 8, 1984 meeting with the accountant and Chapman, Cahill, along with his attorney Silver, was told that his explanations of events were unbelievable and that it appeared he had criminal culpability. During the meeting, Silver noted that he was not a criminal attorney and that he wanted to get immunity for Cahill. In response, Newman told Cahill and Silver that immunity was inappropriate and would not be discussed at that time. Rather, Cahill should determine whether he wanted to make a "proffer of evidence."

At this time, Newman clearly emphasized the difference between immunity and a proffer of evidence. He stressed that a person making a proffer of evidence did not necessarily receive immunity and that he, Newman, did not have the power or authority to act on any immunity request. Moreover, he explained that although Cahill's proposed proffer statement could not be used in the government's case-in-chief, it could be used against Cahill if he ever testified differently and that the government was free to pursue any leads it derived from the statement.

After listening to Newman's presentation, Cahill decided to provide testimony to the government prosecutor. Later that afternoon, Cahill and Silver returned to Newman's office to read and to sign the proffer letter [the November 8, 1984 Statement]. Among its other terms and conditions, the proffer letter also stated that "no other promise or agreement" existed between Cahill and the government.

On November 9, 1984, Cahill again appeared at Newman's office and repeated his previous testimony, but also added that he had given $30,000 in cash "gifts" to Ceaser prior to the collapse of First Financial [the November 9, 1984 Statement].

During the period from November 1984 to May 1985, Newman came to believe that Cahill had not been truthful in his March 1, 1983 Statement to Chapman or in his September 7, 1983 and November 9, 1984 Statements to Lane. Consequently, when Silver called Newman on May 9, 1985, Newman told him that it appeared that Cahill would be indicted. Concerned by this development, Silver set up a meeting between Cahill and Newman for May 14, 1985.

On May 14, Cahill appeared at the U.S. Attorney's office, alone. During a meeting with Newman and FBI agent Lane conducted under the same terms and conditions of the original proffer letter, Cahill admitted to various facts surrounding the three fraud schemes related to First Financial [the May 14, 1985 Statement]. At the same time, Cahill reiterated his belief that he had done nothing wrong. The next day, Cahill again called Newman and repeated his desire to obtain a grant of immunity. And, once again, Newman stated that all discussions with Cahill were pursuant to the 1984 proffer letter and that immunity was not appropriate in this case.

Cahill was subsequently indicted on December 5, 1985 on charges of conspiring to defraud First Financial.

Prior to the start of his trial, Cahill filed a motion to dismiss the indictment against

him and requested an evidentiary hearing. In his motion to dismiss and at the evidentiary hearing, Cahill alleged that Newman had orally granted him "transactional immunity" at a meeting attended by Cahill, his attorney, Newman and Lane. In addition, Cahill sought to suppress four statements he had made to the various government agents, and any evidence derived from them, on the grounds that they had been made involuntarily. He also alleged that the civil and criminal investigations had been unlawfully commingled. Cahill also charged that seven people violated his constitutional rights during the period between the collapse of First Financial and his indictment.

In response to Cahill's charges, each of the seven persons filed affidavits denying his allegations. And, at the evidentiary hearing, five of the seven testified, denying the allegations. During the hearing, the evidence presented included the testimony of Cahill, Newman, Lane, and Silver. In addition, the court admitted 267 pages of material, covering Newman's meetings and contacts with Cahill, into evidence. At the conclusion of the seven-day hearing, the district judge, relying on the credibility of Newman, found that no government agent had ever granted Cahill immunity, that there had been no commingling of the criminal and civil investigations, and that Cahill's statements had been made voluntarily. Judge Holderman found:

> ... that at no time did John Newman or anyone else from the government grant Mr. Cahill immunity through some oral means. I believe that the proffer letter ... states the commitment made by the government to Mr. Cahill ... I believe the most credible person who testified in this hearing was John Newman. I believe he was meticulous in the records that he did keep, and I believe he was consistent in connection with the representations that he testified to were made to Mr. Cahill at all times during the conduct of this investigation.

> The defendant has conceded that the acts in the civil investigation by themselves would not warrant dismissal. I do not believe that taking any of those acts or any of the acts or omissions made by any of the attorneys or representatives of the government engaged in the civil investigation of this, when you combine them with any act by any of the attorneys or other representatives of the government engaged in the criminal investigation, warrant dismissal, either.

> At no time did Mr. Newman or anyone else from the government, civil or criminal, engage in any misconduct by act or omission that misled or improperly induced Mr. Cahill to make statements that he made in violation of his Constitutional rights. Mr. Cahill was not duped at any point in time.

He then denied Cahill's motion to dismiss the indictment and motion to suppress the statements.

## I.

On appeal, Cahill contends that the indictment against him should have been dismissed. To substantiate his position, he makes several interrelated arguments. First, he maintains that the district court erred when it failed to find that the government had promised him immunity in exchange for his testimony and then reneged on its promise—a breach of promise of immunity requiring the dismissal of the indictment. In a closely-related argument, he claims that the statements he made to the investigators were involuntary and they (and the evidence derived from them) should have been suppressed at trial. Finally, he maintains that the government unlawfully used its civil FHLBB investigation to gather information for its criminal investigation. We address each of these issues in turn.

As this court has noted, it is "beyond question that, in our system of justice, '[a]ny agreement made by the government must be scrupulously performed and kept.' " *United States v. Brimberry*, 744 F.2d 580, 587 (7th Cir.1984), *cert. denied*, 481 U.S. 1039, 107 S.Ct. 1977, 95 L.Ed.2d 817 (1987) (citing *United States v. Lyons*, 670 F.2d 77, 80 (7th Cir.), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354

(1982)). The prosecution of a defendant based on direct or indirect testimony taken after a specific promise of immunity, therefore, warrants dismissal of an indictment. *See id.*

In this case, the issue of whether the government breached a promise of immunity turns largely on the district court's determinations of credibility. As we have consistently held, the district court is entitled to make credibility determinations. *United States v. Carter*, 910 F.2d 1524 (7th Cir.1990); *AMP, Inc. v. Fleischhacker*, 823 F.2d 1199 (7th Cir.1987). For purposes of review, therefore, we will show considerable deference to the district court's factual findings unless they are clearly erroneous. *Free v. United States*, 879 F.2d 1535 (7th Cir.1989); *United States v. Lima*, 819 F.2d 687, 688 (7th Cir.1987).

■ In support of his position, Cahill maintains that the district court incorrectly resolved the issue of whether Newman unequivocally promised him immunity in favor of the government. We disagree. In assessing the relative credibility of the various witnesses, the court concluded that "the most credible person who testified in this hearing was John Newman." To support this determination, the district court referred to Newman's "meticulous" record-keeping as to the events of the case. On appeal, Cahill maintains that these same contemporaneous records substantiate his contention that Newman's testimony was not credible. Specifically, he points to various inconsistencies between Newman's records and the testimony elicited during the hearing. For instance, Cahill argues that it is "curious, at the very least" that the only notation of his May 14, 1985 Statement is a single entry on Newman's calendar and that Newman's documentation of telephone conversations with Cahill is suspect. These inconsistencies are minor, however, and do not compel the conclusion, as Cahill maintains, that the government fabricated evidence to support its prosecution. Because the district court was able to weigh the testimony and observe the demeanor of the witnesses, we hold that its

credibility determinations are not clearly erroneous.

■ Because Newman's testimony was credible, the district court's determination that no offer of immunity was ever made to Cahill is supported by the evidence. While Newman did explain the concept of immunity to Cahill and his attorney, he specifically told them to forget about receiving immunity because it was inappropriate and he did not have the authority to grant it. Also, Silver, Cahill's former attorney, testified that he could not recall Newman saying a single specific word that would lead a reasonable person to conclude that he had granted immunity to Cahill. Moreover, Cahill signed a proffer of evidence letter which specifically stated that "no other promise or agreement" existed between the government and Cahill, while at the same time Newman emphasized that a person making a proffer of evidence does not necessarily receive immunity at a later date.

In *United States v. Brimberry*, 744 F.2d 580 (7th Cir.1984), this court held that a defendant who received a specific, written promise of immunity could not be prosecuted for offenses discovered as a direct or indirect result of the defendant's testimony. Because there was no offer of immunity here, Cahill's reliance on *Brimberry* is misplaced. Rather, this case more closely resembles that of *United States v. Serlin*, 538 F.2d 737, 749 (7th Cir.1976), where this court affirmed a defendant's conviction because there was no evidence that the government had breached a promise of immunity other than the defendant's own testimony. Because the district court's finding that Cahill was never offered immunity is supported by the evidence, we affirm its refusal to dismiss the indictment against Cahill.

At the evidentiary hearing, Cahill also sought to suppress statements he had made to the government agents, as well as any evidence the government derived from them. On appeal, Cahill again argues that four statements he made to the various government agents were not voluntarily

given, but were, instead, coerced by the government's promise of immunity.

■ The issue of voluntariness "is a legal question requiring *de novo* review." *United States v. Hawkins*, 823 F.2d 1020, 1022 (7th Cir.1987) (citing *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)). While this holding has been criticized, *see, e.g., United States v. Wildes*, 910 F.2d 1484, 1485 (7th Cir.1990); *United States v. Rutledge*, 900 F.2d 1127, 1128–29 (7th Cir.1990), for the purposes of this appeal, we independently examine whether the statements were voluntary. When determining the voluntariness of a particular statement, the test is whether under the totality of the circumstances the statement was freely given. *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *Holleman v. Duckworth*, 700 F.2d 391, 396 (7th Cir.1983). Among the factors to be considered are the defendant's prior experience with the criminal justice system, *United States v. Oglesby*, 764 F.2d 1273, 1277–78 (7th Cir.1985); *United States v. Anglian*, 784 F.2d 765, 768–69 (6th Cir.), *cert. denied*, 479 U.S. 841, 107 S.Ct. 148, 93 L.Ed.2d 89 (1986), and whether the defendant initiated contact with law enforcement officials, *Stawicki v. Israel*, 778 F.2d 380 (7th Cir.1985), *cert. denied*, 479 U.S. 842, 107 S.Ct. 150, 93 L.Ed.2d 91 (1986). Of course, if Cahill's testimony was induced by the government's promise of immunity, it was involuntary and must be suppressed. *United States v. Gonzalez*, 736 F.2d 981 (4th Cir. 1984).

■ Because there was no offer of immunity, *see supra*, the cases cited by Cahill are inapposite. *See United States v. Brimberry*, 744 F.2d 580 (7th Cir.1984) (specific promise of immunity); *United States v. Society of Independent Gasoline Marketers*, 624 F.2d 461 (4th Cir.1979) (promise of immunity made by Justice Department lawyer). This finding, however, does not end the inquiry into the voluntariness of Cahill's statements since he further contends that he made the November 8,

1984 and May 14, 1985 Statements only because he *believed* that he possessed immunity from prosecution.

■ A defendant's perception that he is providing testimony under a grant of immunity does not make his statement involuntary, unless the perception was reasonable. *Cf. United States v. Shears*, 762 F.2d 397, 401–03 (4th Cir.1985). With respect to the November 8, 1984 and May 14, 1985 Statements, Cahill's perception was unreasonable. All the witnesses (with the exception of Cahill) testified that no offer of immunity was ever made. At the evidentiary hearing, Cahill's attorney was unable to recall any specific statement made by Newman that would support Cahill's perception that he had been granted immunity. Moreover, Cahill was told he was a possible defendant and signed a proffer letter, after Newman explained the differences between it and an offer of immunity, that clearly stated that there had been no offer or grant of immunity. The May 14, 1985 Statement was given under the same terms and conditions outlined in the proffer letter; therefore both statements given after Cahill had signed the proffer letter were voluntarily provided.

■ Cahill claims that his March 1, 1983 Statement was involuntary because of his reliance on the fact that he was not a subject of the criminal investigation. At the time of the deposition, however, he was not a subject of the investigation. As previously noted, Cahill became a target only after Newman's October 10, 1984 meeting with Conlon and Troia. Therefore, because the prosecution did not have reason to believe that Cahill had committed a specific crime, it did not act deceptively in obtaining Cahill's statement. *See, e.g., United States v. Goldstein*, 611 F.Supp. 626 (N.D. Ill.1985).

■ Finally, Cahill maintains that his September 7, 1983 Statement to FBI agent Lane was involuntary because Newman had told Cahill's attorney that Cahill was not a target of the investigation when he knew otherwise. A witness, however, is not entitled to target warnings. *United*

*States v. Washington,* 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977); *United States v. Burke,* 781 F.2d 1234, 1245 (7th Cir.1985). All the witnesses to the meeting, moreover, stated that Newman informed Cahill that "as of that time" he was "not a subject" of a criminal investigation but that his status "could change." This representation certainly cannot be construed as a promise of immunity warranting suppression of the statement.

■ Cahill also contends that the government impermissibly used the FHLBB and FSLIC civil investigations to gather information for its criminal prosecution. In support of his position, Cahill cites *United States v. LaSalle National Bank,* 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), for the proposition that once a matter has been referred for criminal prosecution, government civil authorities cannot continue to obtain and prepare information for the government's prosecutors. Although there is some debate whether *LaSalle National Bank* remains good law since the 1982 amendments to 26 U.S.C. § 7602, *compare United States v. Michaud,* 907 F.2d 750 (7th Cir.1990) (en banc) (majority opinion) (summons issued by Internal Revenue Service after referral to Justice Department or it has abandoned any proper civil purpose should not be enforced) and *Hintze v. Internal Revenue Service,* 879 F.2d 121, 128 n. 8 (4th Cir. 1989) *with Michaud,* at 756 (Posner, J., dissenting), we nevertheless proceed on the basis that it does. In support of this argument, Cahill points to several specific events which he believes demonstrate that the criminal investigation became intermixed with the civil investigation. Therefore, he argues that this commingling of the civil and criminal investigations mandates the exclusion from evidence of any statements he made in several depositions to Chapman.

Cahill overlooks the differences between his case and *LaSalle National Bank.* In *LaSalle National Bank,* the Internal Revenue Service, pursuant to statutory authority, used its civil summons power to pursue an investigation for the purpose of unearthing evidence of criminal conduct. The Court held that it would "not countenance delay in submitting a recommendation [to prosecute] to the Justice Department when there is an institutional commitment to make the referral and the Service merely would like to gather additional evidence for the prosecution." *Id.,* 437 U.S. at 316–17, 98 S.Ct. at 2367–68. In this situation, the government agency whose conduct is questioned has dissimilar powers. Unlike the Internal Revenue Service, the FHLBB has only limited civil authority and has no ability to investigate criminal cases itself; instead, the FHLBB refers all criminal matters to the Department of Justice for investigation and prosecution. The type of abuse found in *LaSalle National Bank* is, accordingly, minimized when the FHLBB pursues a civil investigation.

Moreover, the district court found that the two investigations were, at all times, separate, distinct and independent of each other; that is, the civil investigation was not conducted for the purpose of obtaining evidence for the criminal prosecution. This finding is supported by the evidence. First, Chapman, the FHLBB investigator, alerted Cahill prior to his cooperation that any evidence of criminal conduct would be forwarded to the Department of Justice. Despite this warning, Cahill gave a deposition he was not obligated to give. Cahill was also aware that criminal matters were not within Chapman's jurisdiction and Chapman repeatedly told Cahill that he had nothing to do with any potential grant of immunity and that Cahill would have to talk to the United States Attorney's office with respect to those concerns. Second, Chapman and Newman also clearly worked to prevent any commingling of their investigations. At one early point, Newman stressed to Chapman that they would be conducting "separate investigations." Finally, Chapman discontinued the FHLBB investigation immediately after receiving his "Prohibition and Removal Order" in May, 1983. We, therefore, agree with the district court's finding that the government did not commingle its civil and criminal investigations in violation of Cahill's rights.

## II.

Defendant's other arguments are without merit and warrant no discussion. For the foregoing reasons, we AFFIRM the convictions of Eugene J. Cahill, Sr.