184 F.3d 373 (4th Cir. 1999)
 MINYARD ENTERPRISES, INCORPORATED; JBAND CR, INCORPORATED, Plaintiffs-Appellees,
v.
SOUTHEASTERN CHEMICAL & SOLVENT COMPANY, Defendant-Appellant,
and
PEE DEE TANK COMPANY, Defendant. MINYARD ENTERPRISES, INCORPORATED;
JBAND CR, INCORPORATED, Plaintiffs-Appellants,
v.
SOUTHEASTERN CHEMICAL & SOLVENT COMPANY, Defendant-Appellee,
and
PEE DEE TANK COMPANY, Defendant.
 Nos. 98-1207, 98-1264
 UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
 Argued: January 27, 1999
Decided: July 13, 1999
Amended: August 9, 1999
 
 Appeals from the United States District Court for the District of South Carolina, at Greenville. Henry M. Herlong, Jr., District Judge; William M. Catoe, Jr., Magistrate Judge.[Copyrighted Material Omitted][Copyrighted Material Omitted]
 COUNSEL ARGUED: David Wegner Burchmore, SQUIRE, SANDERS & DEMPSEY, L.L.P., Cleveland, Ohio, for Appellant. William Alexander Coates, LOVE, THORNTON, ARNOLD & THOMASON, P.A., Greenville, South Carolina; William Henry Thomas, III, WILLIAM H. THOMAS, III, P.A., Greenville, South Carolina, for Appellees. ON BRIEF: Van Carson, SQUIRE, SANDERS & DEMPSEY, L.L.P., Cleveland, Ohio; Knox L. Haynsworth, III, Chris B. Roberts, BROWN, MASSEY, EVANS, MCLEOD & HAYNSWORTH, P.A., Greenville, South Carolina, for Appellant.
 Before WIDENER, MURNAGHAN, and HAMILTON, Circuit Judges.
 Affirmed in part, vacated in part, and remanded by published opinion. Judge Hamilton wrote the opinion, in which Judge Widener and Judge Murnaghan joined.
 OPINION
 HAMILTON, Circuit Judge:
 
 
 1
 Minyard Enterprises, Inc. (Minyard) and JB & CR, Inc. (JB & CR) (collectively the Plaintiffs) are the past and present owners, respectively, of a parcel of land (the Property) located on Laurens Road in Greenville, South Carolina. For years, Minyard operated an automobile dealership (the Dealership), including an automobile body and paint shop, on the Property. Prior to the time Minyard sold the Property to JB & CR in July 1992, the Property became environmentally contaminated.
 
 
 2
 Believing that on November 22, 1988, Southeastern Chemical & Solvent Company (Southeastern) caused the contamination by negligently removing an underground storage tank located on the Property, which contained, inter alia, paint thinner that had been used in the automobile body and paint shop, Minyard filed the present action against Southeastern on October 18, 1994, in the United States District Court for the District of South Carolina. The complaint alleged a cause of action pursuant to § 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), see 42 U.S.C. § 9607(a), and several causes of action pursuant to South Carolina common law. JB & CR joined the suit a short time thereafter as a plaintiff.
 
 
 3
 Pursuant to § 107(a) of CERCLA, the Plaintiffs sought to recover their costs in obtaining several environmental assessments, plus prejudgment interest, as well as a declaratory judgment for reimbursement of all future costs to remediate the property (i.e., Response Costs). Minyard also sought damages from Southeastern for diminution in value of the Property under, inter alia , breach of contract and negligence theories under South Carolina common law.[1]
 
 
 4
 Following a bench trial, the magistrate judge[2] found Southeastern and the Plaintiffs were responsible parties for the contamination under § 107(a) of CERCLA, but apportioned past and future Response Costs among them pursuant § 113(f) of CERCLA. See 42 U.S.C. § 9613(f). In this regard, the magistrate judge entered judgment in favor of the Plaintiffs for $42,817.58, representing eighty percent of the past Response Costs, and, as yet, an undetermined amount, representing eighty percent of the future Response Costs. The magistrate judge also found that Minyard and JB & CR were each responsible for ten percent of past and future Response Costs. With respect to Minyard's negligence and breach of contract claims, the magistrate judge found in favor of Minyard and awarded it $200,000, representing the diminished value of the Property.
 
 
 5
 On appeal, Southeastern challenges as clearly erroneous the magistrate judge's finding that it ruptured an underground storage tank while removing a system of underground storage tanks from the Property, thus proximately causing the Property to become environmentally contaminated. According to Southeastern, because there is no credible evidence that it ruptured the underground storage tank, the judgment with respect to Minyard's negligence claim must be reversed. Southeastern also contends that the magistrate judge erred in determining that in rupturing one of the underground storage tanks, it breached a contractual duty it owed Minyard not to damage the Property. Accordingly, Southeastern seeks reversal of the judgment with respect to Minyard's breach of contract claim. Southeastern also contends that Minyard's negligence and breach of contract claims are barred by the statute of limitations. Further, Southeastern contends that if we affirm the magistrate judge's finding of liability with respect to Minyard's negligence and breach of contract claims, we must vacate the magistrate judge's $200,000 award in connection with those claims as duplicative of his award pursuant to CERCLA.
 
 
 6
 Moreover, Southeastern contends the magistrate judge erred in holding it liable for contribution for Response Costs pursuant to § 113(f) of CERCLA, because while the Plaintiffs expressly alleged a cause of action for recovery of all Response Costs pursuant to § 107(a) of CERCLA, they did not expressly seek contribution among potentially responsible parties pursuant to § 113(f) of CERCLA in their complaint. In the alternative, Southeastern seeks vacatur of the judgment with respect to the damages portion of the Plaintiffs' contribution claim pursuant to § 113(f) of CERCLA and a remand for the magistrate judge to reapportion costs with respect to that claim, asserting that the magistrate judge, in apportioning costs, improperly placed the burden of proving the appropriate apportionment of costs on Southeastern instead of on the Plaintiffs.
 
 
 7
 Minyard cross-appeals, claiming the magistrate judge erred in not awarding it $2,375,000, which it claims represents the full amount owed to it for diminution in value of the Property. For reasons that follow, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.
 
 
 8
 * Prior to December 1986, Minyard's predecessors-in-interest owned the Dealership and the Property.[3] In 1977, Minyard Sr., on behalf of the Dealership, entered into an agreement with Southeastern for it to install, lease, supply, and maintain an underground storage tank system, known as the Transchem System, on the Property.[4] The Transchem System consisted of four tanks installed five feet underground. Non-chlorinated solvents, supplied by Southeastern, were stored in three of the tanks and were transported from the tanks to the Dealership's automobile body and paint shop where they were dispensed and used as paint thinner.[5] Used paint thinner was collected and returned to the fourth tank, known as the waste tank, via an underground pipe.
 
 
 9
 In the early 1980s, the Dealership discontinued purchasing paint thinner solvents from Southeastern. It continued, however, until late 1984 or early 1985 to use the Transchem System as a waste receptacle for solvents obtained from other vendors.[6] On June 6, 1984, the Dealership, through its employee, Tommy Carson, asked Southeastern to remove the Transchem System, which it failed to do at that time. The request was repeated in May 1986 to no avail.[7]
 
 
 10
 In December 1986, Minyard Enterprises, Inc. (Minyard) became the owner of the Dealership and the Property. Thereafter, Southeastern continued to maintain the Transchem System for Minyard. Nearly two years later, on November 22, 1988, Southeastern ruptured one of the Transchem System tanks while attempting to unearth it for removal of the entire Transchem System from the Property.[8] The rupture of the tank resulted in the Property becoming environmentally contaminated, although Minyard did not become aware of the contamination for some time.
 
 
 11
 In 1991, William Bradshaw (Bradshaw) contracted to purchase the Dealership from Minyard. Additionally, Bradshaw separately contracted to purchase the Property for $4,000,000 contingent upon his receiving complete financing for the purchase price plus $200,000 to finance property improvements from South Carolina National Bank (SCNB). Bradshaw's purchase of the Property was also contingent upon the Property being certified as free of environmental contamination. Bradshaw also entered into an agreement with Minyard for Bradshaw to manage the Dealership and the Property pending the closing of the contracts. Thereafter, Bradshaw retained a company named Law Engineering to perform an environmental assessment of the Property. Law Engineering identified potential environmental problems with the Property and recommended that all improper waste disposal be reported to the South Carolina Department of Health and Environmental Control (DHEC). Bradshaw then retained the services of Alan Lehocky (Lehocky), a hydrologist, to conduct a further environmental assessment of the Property. Minyard agreed to pay the costs of Lehocky's assessment. Lehocky recommended sampling the locations of three former underground storage tank systems on the Property, including the former location of the Transchem System. Lehocky took the first samples from monitoring wells in the former location of the Transchem System on October 18, 1991. Those samples revealed the presence of volatile organic hydrocarbon contamination. Additional sampling indicated the presence of both chlorinated and nonchlorinated chemicals in the former location of the Transchem System.
 
 
 12
 Lehocky submitted a preliminary study to SCNB, in which Lehocky outlined the findings of his environmental assessment of the Property. In the preliminary study, Lehocky concluded that the area of the Property with the most contamination was the former location of the Transchem System. According to Lehocky, the evidence indicated that this contamination occurred from leaky lines, overspill, or a spill at the time of the Transchem System's removal. Finally, Lehocky concluded that the contamination in the former location of the Transchem System was isolated and contained, and the cost to remedy such contamination would be $200,000.
 
 
 13
 Due to the contamination, Bradshaw offered to purchase the Property at a reduced price of $2,800,000, provided SCNB would finance the clean up of the Property. After SCNB refused to finance the clean up, Bradshaw declined to execute his contract to purchase the Property. Bradshaw executed only his contract to purchase the Dealership, and, thereafter, Bradshaw moved the Dealership off the Property.
 
 
 14
 Minyard then sold the Property to JB & CR for $1,625,000. Thereafter, on March 29, 1994, JB & CR entered into a consent agreement with DHEC and has since been working with DHEC to remediate the Property.
 
 
 15
 As previously stated, on October 18, 1994, Minyard filed suit against Southeastern in the United States District Court for the District of South Carolina. Minyard served Southeastern with a copy of the summons and complaint on October 24, 1994. On December 7, 1994, JB & CR joined the suit as a plaintiff.[9]
 
 
 16
 On April 4, 1996, Southeastern filed a motion for partial summary judgment, claiming the Plaintiffs, as potentially responsible parties for the contamination, could not bring a § 107(a) claim to recover the full amount of Response Costs, but were limited to seeking contribution for Response Costs pursuant to § 113(f) of CERCLA. Southeastern also argued that Minyard's negligence and breach of contract claims were barred by South Carolina's three-year statute of limitations. The district court denied the motion.
 
 
 17
 The district court referred the case to a magistrate judge, see 28 U.S.C. § 636(b)(1)(B), who presided over a bench trial with the parties' consent, see 28 U.S.C. § 636(c)(1). At the conclusion of the trial, the magistrate judge found Southeastern and the Plaintiffs were all responsible parties under § 107(a) of CERCLA and apportioned Response Costs among them pursuant to § 113(f) of CERCLA. The magistrate judge determined that Southeastern was liable for eighty percent of the Plaintiffs' past and future Response Costs and that Minyard and JB & CR were each responsible for ten percent of past and future Response Costs. The magistrate judge determined that Minyard incurred $30,000 in past Response Costs for the costs of Lehocky's preliminary study and JB & CR incurred $23,521.97 in past Response Costs for various environmental assessment reports. Accordingly, the magistrate judge entered judgment(s) in favor of Minyard for $24,000, and JB & CR for $ 18,817.58, representing eighty percent of the past Response Costs of each company, and, as yet, an undetermined amount, representing eighty percent of the future Response Costs. The magistrate judge also awarded $200,000 to Minyard as diminution in value of the Property based upon Minyard's state law claims for negligence and breach of contract. Southeastern noticed a timely appeal, and Minyard noticed a timely crossappeal.
 
 II
 
 18
 We first address Southeastern's challenge to the magistrate judge's finding that it ruptured one of the underground storage tanks while removing the Transchem System from the Property, thus proximately causing the Property to become environmentally contaminated. In order to establish a claim for negligence pursuant to South Carolina common law, a plaintiff must prove by a preponderance of the evidence: (1) that the defendant owed the plaintiff a duty of care; (2) that the defendant breached such duty by an act or omission; and (3) that the plaintiff suffered loss or injury as a proximate result of the defendant's breach of duty. See Cooper v. Laboratory Corp. of Am. Holdings, Inc., 150 F.3d 376, 379 (4th Cir. 1998).
 
 
 19
 Southeastern does not dispute that it owed a duty to Minyard to use due care in removing the Transchem System from the Property. Furthermore, Southeastern does not dispute that it removed the Transchem System from the Property on November 22, 1988. However, Southeastern fully denies that it ruptured one of the underground storage tanks while removing the Transchem System from the Property, thus proximately causing the Property to become environmentally contaminated. On this point, Southeastern contends the magistrate judge's finding to the contrary is in error.
 
 
 20
 On appeal from a bench trial, we may only set aside findings of fact if they are clearly erroneous, and we must give due regard to the opportunity of the trial court to judge the credibility of the witnesses. See Fed. R. Civ. P. 52(a). "A finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. Gypsum Co., 333 U.S. 364, 395 (1948).
 
 
 21
 We conclude the magistrate judge's finding that Southeastern ruptured one of the underground storage tanks while removing the Transchem System from the Property, thus proximately causing the Property to become environmentally contaminated, is not clearly erroneous. Soil samples taken from the former location of the Transchem System revealed the presence of the same type of chemicals as Southeastern supplied for use with the Transchem System. Furthermore, the magistrate judge's finding is fully supported by the eyewitness testimony of Broome, which is corroborated in significant part by the testimony of one of Southeastern's employees. At trial, Broome testified that while he was doing work on a Saturday at the Dealership as an employee of Broome Contractors with coworker Darrell Hodges, he observed Southeastern's crew attempting to remove the Transchem System by digging a hole with a backhoe beside the tanks so that the crew could then lift each tank out of the ground using chains. According to Broome, while the crew was attempting to dig the hole beside the tanks, he heard a crew member yell, "[y]ou busted it," and then he observed the crew set one of the tanks "on the side of the bank." (J.A. 524). Broome testified that a "foul" smelling "sludge" drained out of the tank into the remaining hole in the ground, and the next day the crew filled the hole with dirt. (J.A. 525). Thomas Keels (Keels), an employee of Southeastern, testified that Southeastern generally removes underground storage tank systems by digging a hole with a backhoe beside the tanks so that the crew can lift each tank out of the ground using chains. Keels' testimony corroborates Broome's testimony regarding the general procedure Southeastern used in removing the tanks of the Transchem System from the Property. We conclude that Broome's testimony, as corroborated in significant part by Keels' testimony, is more than sufficient to support the challenged finding.
 
 
 22
 According to Southeastern, the magistrate judge's finding is clearly erroneous because Broome's testimony is inconsistent: (1) with the testimony of Keith Burgess (Burgess), Broome's supervisor, that Broome worked with him on November 22, 1988 at a different job site than the Property; (2) with a work-order record of Broome Contractors showing that on November 22, 1988, Broome worked with Burgess at the different job site referred to by Burgess for five and one-half hours; and (3) with the magistrate judge's finding that Southeastern removed the Transchem System from the Property on November 22, 1988, which is a Tuesday.
 
 
 23
 The evidence relied upon by Southeastern to undermine Broome's testimony does not compel the conclusion that the magistrate judge clearly erred in crediting the heart of Broome's testimony (his witnessing Southeastern rupture the underground storage tank at issue). First, the testimony of Burgess and the work-order record at issue fail to establish that Broome could not have worked on the Property on November 22, 1988. Significantly, Burgess did not testify as to whether he and Broome worked at the different job site the entire work day. Furthermore, the work-order record for the different job site accounts for only five and one-half hours of Broome's entire work day. That leaves two and one-half hours in a regular eight hour work day for Broome to have been on the Property to witness Southeastern remove the Transchem System. Second, the fact that Broome recalled the day he witnessed Southeastern rupture the underground storage tank on the Property as being a Saturday, as opposed to a Tuesday as found by the magistrate judge, is a minor inconsistency that did not require the magistrate judge to reject the heart of Broome's testimony. See United States v. Cahill, 920 F.2d 421, 426 (7th Cir. 1990) (with respect to witness testimony credited by trial court, minor inconsistencies in that testimony did not require that trial court reject heart of testimony). Because, after considering all of the evidence, we are not "left with the definite and firm conviction that a mistake has been committed," Gypsum Co., 333 U.S. at 395, we affirm the magistrate judge's finding that Southeastern ruptured one of the underground storage tanks while removing the Transchem System from the Property, thus proximately causing the Property to become environmentally contaminated.[10]
 
 III
 
 24
 We next address Southeastern's challenge to the magistrate judge's $200,000 award in favor of Minyard on its negligence claim. According to Southeastern, the $200,000 award is duplicative of the award in favor of Minyard under CERCLA. We disagree.
 
 
 25
 The $200,000 damage award is premised upon the magistrate judge's determination that as a result of Southeastern's negligence, Minyard suffered a $200,000 loss in the value of the Property while Minyard still owned it. The $24,000 damage award under CERCLA in favor of Minyard is premised upon eighty percent of Minyard's incurred costs in obtaining Lehocky's preliminary study. The judgment also awarded the Plaintiffs eighty percent of future Response Costs under CERCLA.
 
 
 26
 Southeastern argues the $200,000 damage award is duplicative of the amount the magistrate judge awarded Minyard under CERCLA ($24,000 in past Response Costs and, as yet, an undetermined amount of future Response Costs), because both awards compensated Minyard for the costs to repair the Property. Minyard acknowledges that it is not entitled to be compensated twice for the same wrong. See, e.g., Braswell Shipyards, Inc. v. Beazer E., Inc., 2 F.3d 1331, 1338 (4th Cir. 1993). However, Minyard argues the $200,000 damage award is not duplicative in any manner of the damage award it received under CERCLA. We agree with Minyard.
 
 
 27
 CERCLA provides a private cause of action for the recovery of part or, under some circumstances, all Response Costs against a party responsible for the contamination of a particular piece of property. See 42 U.S.C. §§ 9607(a), 9613(f). One component of Response Costs is the actual cost to repair the contaminated property. See 42 U.S.C. § 9601(23)-(25). Certainly, "CERCLA . . . precludes a plaintiff from recovering cost of repair damages under both CERCLA and state law." Stanton Rd. Assocs. v. Lohrey Enters., 984 F.2d 1015, 1021-22 (9th Cir. 1993); 42 U.S.C. § 9614(b). However, CERCLA does not prevent a plaintiff from recovering damages under state law that are not duplicative of the damages it recovers under CERCLA. See Braswell Shipyards, Inc., 2 F.3d at 1337-39; 42 U.S.C. § 9652(d).
 
 
 28
 Southeastern is incorrect that the $200,000 award and the total award under CERCLA were both intended to compensate Minyard for the costs to repair the Property, i.e. Response Costs. The record is clear that the magistrate judge awarded the $200,000 in favor of Minyard in order to compensate Minyard for diminution in value of the Property proximately caused by Southeastern's negligence. The record is equally clear that the magistrate judge awarded Minyard judgment against Southeastern for $24,000 to partially compensate Minyard for the Response Costs it incurred in obtaining Lehocky's preliminary study. Obviously, these two amounts are intended to compensate Minyard for two separate and distinct harms.
 
 
 29
 The further potential amount the magistrate judge awarded Minyard against Southeastern under CERCLA was to compensate Minyard should it be the party who actually advances or incurs future Response Costs for remediating the Property. By all indications, that party will be JB & CR, the present owner of the Property. Nevertheless, that likelihood is beside the point. The crucial question is whether, assuming arguendo the judgment entered by the magistrate judge stands, the $200,000 damage award for diminution in value of the Property will provide Minyard with a double recovery even should Minyard incur any future Response Costs for the Property, thus requiring Southeastern to reimburse Minyard for eighty percent of those costs. The answer is an unequivocal no, because Minyard no longer owns the Property. Obviously, while Minyard was reimbursed for the $24,000 it incurred as past Response Costs, Minyard cannot benefit economically from future Response Costs.
 
 
 30
 This is not a situation such as in Braswell Shipyards, Inc. In that case, the plaintiff had purchased a parcel of land, which the seller had negligently failed to disclose to the plaintiff was environmentally contaminated. See Braswell Shipyards, Inc., 2 F.3d at 1333-34. After the plaintiff discovered the parcel was environmentally contaminated, it brought suit against the seller, now the defendant, for negligent nondisclosure under South Carolina common law and to recover Response Costs of the property under CERCLA. See id. at 1333. With the parties' assent, the district court bifurcated the negligent nondisclosure claim from the CERCLA claims and stayed the CERCLA claims pending the resolution of the negligent nondisclosure claim. See id. at 1334.
 
 
 31
 After a jury trial on the negligent nondisclosure claim, the jury awarded the plaintiff $1,029,830.82 in actual damages and $1,000 in punitive damages. See id. The actual damages represented the original cost of the parcel and the plaintiff's improvements to it. See id. The defendant renewed its motion for judgment as a matter of law and/or a new trial and a stay in the entry of judgment on the negligent nondisclosure claim pending the outcome of the CERCLA claims. See id. The district court denied the defendant's motions. See id. After finding no just reasons for the delay in the entry of judgment on the negligent nondisclosure claim, the district court entered judgment on that claim pursuant to Federal Rule of Civil Procedure 54(b) in the amount of $2,095,144.45, which included $1,064,313.63 in prejudgment interest. See Braswell Shipyards, Inc., 2 F.3d at 1334.
 
 
 32
 The defendant appealed. See id. Before addressing whether the district court erred in denying the defendant's post-trial motions, this court first resolved the propriety of the district court's Rule 54(b) certification "because we only obtain jurisdiction when an appeal is taken from a final order, 28 U.S.C. § 1291, or from an appealable interlocutory order, 28 U.S.C. § 1292." Braswell Shipyards, Inc., 2 F.3d at 1335. "Rule 54(b) permits a district court to enter final judgment as to one or more but fewer than all claims in a multiclaim action, thus allowing an appeal on fewer than all claims in a multiclaim action." Id. at 1335.
 
 
 33
 We held that the district court abused its discretion in finding no just reasons for the delay in the entry of judgment on the negligent nondisclosure claim. See id. at 1339. We thus remanded the case to the district court with instructions to vacate its order finding no just reasons for the delay in the entry of judgment on the negligent nondisclosure claim and its corresponding judgment, and to conduct further proceedings consistent with our opinion. See id. Critical to our holding that Rule 54(b) certification was inappropriate was our belief that the plaintiff would likely receive an impermissible double recovery by recovering the Response Costs of the property under CERCLA and by also recovering the full purchase price plus the costs of improvements. See id. at 1337-39. In other words, the potentiality existed that the plaintiff would be fully compensated under the negligent nondisclosure claim for the full purchase price of the parcel plus improvements and additionally have the parcel cleaned up under CERCLA at no cost to itself, thus effecting a double recovery.
 
 
 34
 The crucial distinction between the present case and Braswell Shipyards, Inc. is that in the present case Minyard no longer owns the Property. Accordingly, Minyard will not benefit from restoration of the Property under CERCLA. Thus, the $200,000 award to Minyard on its negligence claim for diminution in value of the Property as result of Southeastern's negligence and the CERCLA award to Minyard does not constitute an impermissible double recovery. Accordingly, we affirm the magistrate judge's award of $200,000 to Minyard under South Carolina law for diminution in value of the Property.[11]
 
 IV
 
 35
 Finally, we address Southeastern's argument that the magistrate judge erred in holding it liable for contribution for Response Costs pursuant to § 113(f) of CERCLA, because while the Plaintiffs expressly alleged a cause of action for the full recovery of Response Costs pursuant to § 107(a) of CERCLA, they did not expressly seek contribution among potentially responsible parties pursuant to § 113(f) of CERCLA. In the alternative, Southeastern contends that we must vacate the judgment with respect to the damages portion of the Plaintiffs' contribution claim pursuant to § 113(f) of CERCLA and remand the case for the magistrate judge to reapportion costs because the magistrate judge, in apportioning costs, improperly placed the burden of proving the appropriate apportionment of costs on Southeastern instead of the Plaintiffs.
 
 
 36
 We hold that the magistrate judge did not err in holding Southeastern liable for contribution for Response Costs pursuant to § 113(f) of CERCLA despite the Plaintiffs' failure to expressly seek contribution among potentially responsible parties pursuant to § 113(f) of CERCLA in their complaint. However, we agree with Southeastern that, in apportioning costs pursuant to § 113(f) of CERCLA, the magistrate judge improperly placed the burden of proving the appropriate allocation of costs on Southeastern instead of the Plaintiffs. Therefore, we vacate the damages portion of the judgment as it pertains to the Plaintiffs' claim for contribution pursuant to § 113(f) of CERCLA and remand for further proceedings consistent with this opinion.
 
 
 37
 Section 107(a) of CERCLA, provides a private party a strict liability cause of action to recover costs of assessing and cleaning up an environmentally contaminated piece of real property from the parties responsible for the contamination.[12] See 42 U.S.C. § 9607(a); Bedford Affiliates v. Sills, 156 F.3d 416, 423-24 (2d Cir. 1998); Pneumo Abex Corp. v. High Point, Thomasville & Denton R.R. Co., 142 F.3d 769, 774 (4th Cir. 1998). However, a responsible party cannot recover Response Costs under § 107(a) of CERCLA from another responsible party. See Pneumo Abex Corp., 142 F.3d at 776. Rather, for one responsible party to recover Response Costs from another responsible party, the first responsible party must seek contribution from the other responsible party pursuant to § 113(f) of CERCLA. See Pneumo Abex Corp., 142 F.3d at 776.[13]
 
 
 38
 Notably, under § 113(f) of CERCLA, the Plaintiff bears the burden of proving the defendant is a responsible party under § 107(a) of CERCLA and also the burden of proving the defendant's equitable share of costs. See Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp., 153 F.3d 344, 348 (6th Cir. 1998). "In resolving contribution claims, the court may allocate [R]esponse[C]osts among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). While the court has considerable discretion as to what and how many equitable factors it will consider in allocating Response Costs among the responsible parties, see Pneumo Abex Corp., 142 F.3d at 776 n.4, liability under § 113(f) is several only, as opposed to joint and several under§ 107(a), see Centerior Serv. Co., 153 F.3d at 350.
 
 
 39
 Here, Southeastern does not dispute that as the owner of the Transchem System it qualifies as a responsible party under CERCLA. See 42 U.S.C. §§ 9601(9), 9607(a). As stated previously, Southeastern contends the magistrate judge erred in holding it liable for contribution to Response Costs of the Property pursuant to§ 113(f) of CERCLA, because while the Plaintiffs expressly alleged a cause of action in their complaint for recovery of all Response Costs pursuant to § 107(a) of CERCLA, they did not expressly seek in their complaint contribution among potentially responsible parties pursuant to § 113(f) of CERCLA. Southeastern's contention is without merit.
 
 
 40
 Federal Rule of Civil Procedure 54(c) (Rule 54(c)) commands that a trial court "shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." Fed. R. Civ. P. 54(c). We have characterized Rule 54(c) as "a clarification of the fundamental point . . . that the relief to which a claimant is entitled is not limited to the relief it requested in its original demand for judgment." Gilbane Bldg. v. Federal Reserve Bank of Richmond, 80 F.3d 895, 901 (4th Cir. 1996). The theory underpinning Rule 54(c) is that "the dimensions of a lawsuit are measured by what is pleaded and proven, not what is demanded." Thomas v. Pick Hotels Corp., 224 F.2d 664, 666 (10th Cir. 1955); see also Gilbane Bldg., 80 F.3d at 900 ("[T]he essence of a claim remains its factual elements."). This is so because "[t]he pleadings serve only as a rough guide to the nature of the case." Robinson v. Lorillard Corp., 444 F.2d 791, 803 (4th Cir. 1971). The only possibly relevant exception to Rule 54(c)'s mandate is if the Plaintiffs' failure to demand the appropriate alternative relief would be unfairly prejudicial to Southeastern.[14] See Albemarle Paper Co. v. Moody, 422 U.S. 405, 424 (1975); Gilbane Bldg., 80 F.3d at 901. Thus, the two questions that we must answer are: (1) whether the Plaintiffs have properly pleaded and proven allegations supporting an entitlement to contribution from Southeastern for Response Costs pursuant to § 113(f) of CERCLA, and (2) whether the Plaintiffs' failure to expressly demand relief in their complaint pursuant to § 113(f) unfairly prejudiced Southeastern. We answer the first question in the affirmative and the second question in the negative.
 
 
 41
 The Plaintiffs are entitled to contribution from Southeastern for Response Costs pursuant to § 113(f) of CERCLA if they pleaded and proved allegations supporting that they, as well as Southeastern, are responsible parties under § 107(a) of CERCLA. This the Plaintiffs have done. As we have previously stated, Southeastern does not dispute that, as the alleged and proven owner of the Transchem System removed from the Property, it qualifies as a responsible party under § 107(a) of CERCLA. Furthermore, the Plaintiffs pleaded and proved that Minyard had a contract with Southeastern for Southeastern to remove the Transchem System containing hazardous substances from the Property. Section 107(a)(3) provides, inter alia, that a party qualifies as a responsible party if that party "by contract, agreement, or otherwise arranged for disposal . . . of hazardous substances owned or possessed by such [party], by any other party or entity, at any facility . . . owned or operated by another party or entity and containing such hazardous substances . . . ." 42 U.S.C.§ 9607(a)(3). No party disputes that the Transchem System constitutes a facility as that term is found in § 107(a)(3) of CERCLA and specifically defined in § 101(9) of CERCLA, 42 U.S.C. § 9601(9). Accordingly, Minyard qualifies as a responsible party under § 107(a) of CERCLA. Finally, the Plaintiffs pleaded and proved that JB & CR is the present owner of the Property, which all parties agree constitutes a "facility" as that term is defined in CERCLA. Because § 107(a)(1) of CERCLA provides that a party is a responsible party if it is the owner of a facility, see Nurad, Inc. v. William E. Hooper & Sons, Co., 966 F.2d 837, 841 (4th Cir. 1992), JB & CR also qualifies as a responsible party under § 107(a) of CERCLA.
 
 
 42
 Because the Plaintiffs have pleaded and proven allegations supporting that they, as well as Southeastern, are responsible parties under § 107(a) of CERCLA, it cannot be said that the magistrate judge erred in holding Southeastern liable for contribution for Response Costs pursuant to § 113(f) of CERCLA, despite the Plaintiffs' failure to expressly seek contribution among potentially responsible parties pursuant to § 113(f) of CERCLA in their complaint, unless we determine that Southeastern was unfairly prejudiced by the Plaintiffs' failure to expressly seek contribution pursuant to § 113(f) of CERCLA in their complaint. We can discern no such prejudice to Southeastern from the record. Southeastern argued in its pretrial motions that the Plaintiffs were responsible parties and thus should be pursuing a claim for contribution pursuant to § 113(f) of CERCLA. Accordingly, it is clear that Southeastern had notice of the potentiality of the magistrate judge to apportion costs pursuant to § 113(f) of CERCLA. Furthermore, Southeastern has not even suggested how it might have been prejudiced. Accordingly, the unfair prejudice exception to the mandate of Rule 54(c) is inapplicable, and Southeastern is subject to the rule's full force.
 
 
 43
 We lastly address Southeastern's alternative argument that the magistrate judge improperly placed the burden of proving the appropriate allocation of Response Costs on it rather than the Plaintiffs. As previously stated, under § 113(f) of CERCLA the Plaintiffs must bear the burden of proving Southeastern's equitable share of costs. See Centerior Serv. Co., 153 F.3d at 348. Below, the magistrate judge correctly recognized that the party seeking to allocate costs bears the burden of proving the allocation requested is appropriate. Nevertheless, the magistrate judge improperly placed this burden on Southeastern instead of the Plaintiffs. Because we obviously cannot be certain how the magistrate judge would have equitably allocated the Response Costs under § 113(f) of CERCLA had it placed the burden of proof on the Plaintiffs, we vacate the judgment with respect to the damages portion of the Plaintiffs' contribution claim pursuant to § 113(f) of CERCLA and remand the case for the magistrate judge to reapportion costs with the burden of proving Southeastern's equitable share resting upon the Plaintiffs. To aid the magistrate judge on remand, we suggest that, in addition to considering the equitable factors he deems appropriate, see Centerior Serv. Co., 153 F.3d at 354, he consider the fact that JB & CR purchased the Property at a reduced price on account of its contaminated state, the fact that JB & CR purchased the Property with knowledge of its contaminated condition and of the minimum estimated cost of $200,000 to remediate it, and the fact that the Property may appreciate following its re-mediation.[15]
 
 V
 
 44
 In conclusion, we hold: (1) that the magistrate judge's finding that Southeastern ruptured one of the underground storage tanks while removing the Transchem System from the Property, thus proximately causing the Property to be contaminated, is not clearly erroneous; (2) the $200,000 award to Minyard on its negligence claim for diminution in value of the Property as a result of Southeastern's negligence and the CERCLA award to Minyard do not constitute an impermissible double recovery; (3) the magistrate judge did not err in holding Southeastern liable for contribution for Response Costs pursuant to § 113(f) of CERCLA despite the Plaintiffs' failure to expressly seek contribution among potentially responsible parties pursuant to § 113(f) of CERCLA in their complaint; and (4) in apportioning all Response Costs pursuant § 113(f) of CERCLA, the magistrate judge improperly placed the burden of proving the appropriate allocation of Response Costs on Southeastern rather than on the Plaintiffs. Accordingly, we affirm the judgment in all respects except that we vacate the judgment with respect to the Response Cost(s) portion of the Plaintiffs' contribution claim pursuant to § 113(f) of CERCLA and remand the case for the magistrate judge to reapportion Response Costs with the burden of proving Southeastern's equitable share resting upon the Plaintiffs.
 
 
 45
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED
 
 
 
 Notes:
 
 
 [1]
 The Plaintiffs also sought damages pursuant to various state law claims, including nuisance, strict products liability, and trespass. The magistrate judge entered judgment in favor of Southeastern on all of these claims. On appeal, the Plaintiffs do not challenge the magistrate judge's decision to enter judgment in favor of Southeastern on these claims.
 
 
 [2]
 This case was tried before a United States magistrate judge by consent of the parties. See 28 U.S.C. § 636(c)(1).
 
 
 [3]
 Minyard's predecessors-in-interest were Judson T. Minyard, Sr. (Minyard Sr.), Judson T. Minyard, Jr., and Judson T. Minyard, Incorporated.
 
 
 [4]
 According to Southeastern, the contract was automatically renewed each year unless the Dealership provided sixty days' written notice of cancellation. In the event of cancellation, upon thirty days' written notice, the Dealership had the option to purchase, lease, or pay for the removal of the Transchem System.
 
 
 [5]
 The non-chlorinated solvents supplied by Southeastern contained a blend of acetone, toluene, xylene, methanol, and butyl alcohol.
 
 
 [6]
 These other vendors supplied various chlorinated solvents, which were used, for example, to clean floors and degrease parts and equipment.
 
 
 [7]
 At trial, two of Southeastern's former employees testified that Southeastern maintained a policy to remove Transchem Systems only when it began its removal program and not when requested by customers.
 
 
 [8]
 Southeastern's records indicate that it removed the Transchem System from the Property on November 22, 1988. Furthermore, Kenneth Broome (Broome), an employee of Broome Contractors, testified at trial that, while he was doing work for Broome Contractors at the Dealership, he observed Southeastern's crew attempting to remove the Transchem System by digging a hole with a backhoe beside the tanks so that the crew could then lift each tank out of the ground using chains. According to Broome, while the crew was attempting to dig the hole beside the tanks, he heard a crew member yell, "[y]ou busted it," and then he observed the crew set one of the tanks "on the side of the bank." (J.A. 524). According to Broome, a "foul" smelling "sludge" drained out of the tank into the remaining hole in the ground, and the next day Southeastern's crew filled the hole with dirt. (J.A. 525).
 
 
 [9]
 The Plaintiffs also named Pee Dee Tank Company, the company that manufactured the Transchem System, as a defendant. However, on March 5, 1996, the district court dismissed it as a defendant pursuant to the consent of all parties. Pee Dee Tank Company is not a party in the present appeal.
 
 
 [10]
 Southeastern also challenges the sufficiency of the evidence in various respects to support Minyard's breach of contract claim. Under South Carolina law, "[w]hen an identical set of facts entitle the plaintiff to alternative remedies, he may plead and prove his entitlement to either or both; however, the plaintiff may not recover both." Save Charleston Found. v. Murray, 333 S.E.2d 60, 64 (S.C. Ct. App. 1985). Because Minyard's negligence and breach of contract claims are based upon the same facts, and because we conclude Minyard may recover based upon his negligence claim, we do not reach its breach of contract claim. Furthermore, we find Southeastern's statute of limitations defense to Minyard's negligence and breach of contract claims unavailing. Southeastern argues that South Carolina's three-year statute of limitations ran on Minyard's negligence and breach of contract claims on October 18, 1994, and therefore, Minyard's failure to serve it with a summons and complaint by October 18, 1994 barred those claims. See S.C.R.C.P. 3(a) ("A civil action is commenced by filing and service of a summons and complaint."). For its argument that South Carolina's three-year statute of limitations ran on October 18, 1994, Southeastern relies on the fact that Lehocky performed meter readings on October 18, 1991, at the location of the former Transchem System, which indicated contamination, and attempts to impute knowledge of those readings to Minyard through a common law agency theory. Under South Carolina common law, "[a]gency is a fiduciary relationship which results from the manifestation of consent by one person to another person to be subject to the control of the other and to act on his behalf." Peoples Fed. Sav. & Loan Ass'n v. Myrtle Beach Golf & Yacht Club, 425 S.E.2d 764, 773 (S.C. Ct. App. 1993). Because the record does not support a finding that Lehocky consented to be subject to the control of Minyard, Southeastern's attempt to prove that Minyard had knowledge of the contamination at issue as of October 18, 1991 through a common law agency theory fails. We accordingly reject Southeastern's statute of limitations defense. We need not reach the question of whether in a federal question case, filed in federal court, pendent state law claims are not commenced until the filing and service of a summons and complaint, even though federal claims are commenced simply upon filing of a complaint. Compare Walker v. Armco Steel Corp., 446 U.S. 740, 751 (1980) (holding that in a federal diversity case Federal Rule of Civil Procedure 3 does not commence an action on a state law claim for statute of limitations purposes), with West v. Conrail, 481 U.S. 35, 39 (1987) (holding that in a federal question case the action is commenced for statute of limitations purposes with respect to federal claims when, as provided by Federal Rule of Civil Procedure 3, process is filed with the court, regardless of when the complaint was actually served on the defendants).
 
 
 [11]
 In its cross appeal, Minyard, in essence, contends the magistrate judge's finding that Southeastern's negligence only resulted in the Property diminishing $200,000 in value is clearly erroneous. According to Minyard, Southeastern's negligence resulted in the Property diminishing $2,375,000 in value, representing the difference between the amount Bradshaw originally agreed to pay to purchase the Property, conditioned upon it being free from environmental contamination, and the amount for which JB & CR ultimately purchased the Property. In support, Minyard relies on the fact that JB & CR purchased the Property in its contaminated condition for $1,625,000 and the fact that Minyard's president testified at trial that the Property had a fair market value of $1,625,000 in its contaminated condition, see Hawkins v. Greenwood Dev. Corp., 493 S.E.2d 875, 881-82 (S.C. Ct. App. 1997) (holding that an owner of real property is qualified by fact of ownership to give his or her estimate as to value of real property with determination as to the weight to be given such testimony left to the finder of fact). After reviewing the entire record, we are not left with a definite and firm conviction that a mistake has been committed on this issue. See Gypsum Co., 333 U.S. at 395. Accordingly, we reject Minyard's contention that the magistrate judge's finding with respect to the diminution in value of the Property as a result of Southeastern's negligence is clearly erroneous.
 
 
 [12]
 Section 107(a) of CERCLA lists four classes of responsible parties. See 42 U.S.C. § 9607(a)(1)-(4).
 
 
 [13]
 In relevant part, § 113(f) of CERCLA provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section [107(a)]" for Response Costs. 42 U.S.C. § 9613(f)(1).
 
 
 [14]
 The only other limiting principle to Rule 54(c)'s mandate is that a remedy desired by none of the parties should not be forced upon them. See Robinson, 444 F.2d at 803. As the Plaintiffs desire affirmance of the judgment in their favor with respect to the magistrate judge's award pursuant to § 113(f) of CERCLA, this limitation is obviously inapplicable.
 
 
 [15]
 The Plaintiffs devote a mere two sentences in their opening brief to an alternative argument in support of their position that the judgment should be affirmed to the extent it awards the Plaintiffs damages pursuant to CERCLA. In this regard, the Plaintiffs specifically assert: "Neither plaintiff was an owner, operator, or arranger in connection with the transchem facility. As such, they are innocent parties under 42 U.S.C. § 9607(b) . . . and may maintain an action pursuant to § 107." (Plaintiffs' Br. at 11). Apparently, the Plaintiffs are attempting to assert at least one of the multiple affirmative defenses provided in § 107(b) of CERCLA. Congress created several statutory affirmative defenses under § 107(b) of CERCLA to being considered a responsible party under § 107(a) of CERCLA in order "[t]o mitigate the harsh effect strict liability often imposes." Bedford Affiliates, 156 F.3d at 425. We need not and do not address their alternative argument, because the record appears to be void of evidence that the Plaintiffs presented it below, and they have failed to show an exceptional circumstance that prevented them from doing so. See Bregman, Berbert & Schwartz, L.L.C. v. United States, 145 F.3d 664, 670 n.8 (4th Cir. 1998) (refusing to address argument raised for the first time on appeal where appellant failed to show exceptional circumstance that prevented it from raising argument below); United States v. Mercedes Benz 2-Door Coupe, 542 F.2d 912, 915 (4th Cir. 1976).