**UNITED STATES of America, Appellant,**

v.

**Charles Wallace SHEARS, Appellee.**

**No. 85–5012.**

United States Court of Appeals, Fourth Circuit.

Argued April 3, 1985.

Decided May 23, 1985.

Mark A. Berthiaume, Asst. U.S. Atty., Baltimore, Md. (J. Frederick Motz, U.S. Atty., Baltimore, Md., on brief), for appellant.

Paul R. Kramer, P.A., Baltimore, Md. (Stuart J. Snyder, Baltimore, Md., on brief), for appellee.

Before WINTER, Chief Judge, and RUSSELL and MURNAGHAN, Circuit Judges.

HARRISON L. WINTER, Chief Judge:

This appeal presents two issues: whether we have jurisdiction over the government's appeal of a suppression order, and if so, whether the district court erred in finding that certain statements made by the defendant were involuntary and therefore should be suppressed. The suppression order was entered before defendant's initial trial began. The initial trial was terminated by the grant of defendant's motion for mistrial. The government's notice of appeal was filed after the mistrial was granted and before the jeopardy of the second trial had attached.

We hold that we do have jurisdiction and that the district court's order must be reversed.

### I. Nature of the Case

Defendant Charles W. Shears was arrested on August 14, 1984 at the Baltimore-Washington International Airport after picking up a parcel of what was later determined to be cocaine. He was advised of his

*Miranda* rights, asked about disposition of the truck he had driven to the airport, and transported by DEA agents Coront and Crawford to the DEA's Baltimore office for processing. Defendant was then taken to the courthouse for his initial appearance before a magistrate, who set his bail at $10,000 cash or corporate surety. While in the marshal's lockup in the courthouse, defendant asked to use the telephone. Agent Coront allowed defendant to make a call, but he suggested that if defendant wished to cooperate, it would be better if no one knew of his arrest. Defendant testified that Coront told him that he would not need a bondsman, and that Coront had some people who wanted to talk to defendant. Defendant remained in custody over the night of August 14.

On August 15, defendant was taken back to the courthouse for the purpose of posting bond. DEA Agent Boronyak and Postal Inspector Reilly met him there, and defendant subsequently made oral and written statements concerning his role in the conspiracy. The agents and defendant gave sharply differing versions of the conversations that precipitated those confessions, but they agreed that after the statements were given the agents sought the intervention of the Assistant U.S. Attorney, who obtained defendant's release on his own recognizance.

Defendant was indicted on August 22, 1984 for various cocaine possession and distribution offenses, and on September 20 he filed a motion to suppress his August 15 statements. The district court scheduled

trial for December 3, 1984 and conducted an evidentiary hearing on the suppression motion that morning. At the conclusion of that hearing the district court ordered that defendant's statements be suppressed.

On the afternoon of December 3, 1984, a jury was chosen and sworn but then dismissed for the evening, with trial scheduled to begin the next morning. Later that night, an undercover narcotics officer was killed in Baltimore and one of the DEA agents expected to testify at defendant's trial was wounded. On the morning of December 4 the government moved for a one-day continuance and defendant moved to sequester the jury. After discussion of those motions, defendant moved for a mistrial, specifically waiving any double jeopardy claim on retrial. The district court granted the motion for a mistrial and rescheduled trial for February 20, 1985. On December 11, 1984, the government noted an appeal from the district court's suppression ruling. The district court subsequently postponed trial pending the outcome of this appeal.

## II. Jurisdiction

■ Defendant contends that we lack jurisdiction of the government's appeal because jeopardy had attached before the appeal was noted. Defendant is correct that jeopardy attaches when the jury is empaneled and sworn, but that fact does not lead to the conclusion that the instant appeal is improper.

■ The relevant part[1] of 18 U.S.C. § 3731 provides:

---

1. Section 3731 of 18 U.S.C. provides in full:

In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

An appeal by the United States shall lie to a court of appeals from a decision or order of a district courts [sic] suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indict-

ment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

The appeal in all such cases shall be taken within thirty days after the decision, judgment or order has been rendered and shall be diligently prosecuted.

Pending the prosecution and determination of the appeal in the foregoing instances, the defendant shall be released in accordance with chapter 207 of this title.

The provisions of this section shall be liberally construed to effectuate its purposes.

An appeal by the United States shall lie to a court of appeals from a decision or order of a district courts [sic] suppressing or excluding evidence ..., not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information....

Defendant argues that the foregoing provision should be read to forbid appeals *noted* "after the defendant has been put in jeopardy." The statute is not a model of clarity, but we think that the only reasonable interpretation of the above language is that the phrase "not made after the defendant has been put in jeopardy" refers to the phrase "a decision or order of a district court," not to "[a]n appeal by the United States." Moreover, the very next paragraph of this section grants the government thirty days in which to appeal, which would be anomalous if instead the appeal had to be filed before jeopardy attached, although we recognize that if a defendant was acquitted before the government's appeal was decided, the first paragraph of the section would operate to moot the appeal since defendant could not be tried anew because of the double jeopardy clause. We believe, therefore, that since the order was entered before jeopardy attached, it is an appealable order under the statute.

Defendant's counsel admitted at oral argument that he had not found any case supporting the construction that he urges us to adopt, and other courts in similar situations have concluded that appellate jurisdiction does exist. *See United States v. Layton*, 720 F.2d 548, 553–54 (9 Cir. 1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1423, 79 L.Ed.2d 748 (1984) (government appealed a district court's resuppression of evidence following a mistrial because of a hung jury); *United States v. Harshaw*, 705 F.2d 317 (8 Cir.1983) (district court ruled certain testimony inadmissible after it had come into evidence and therefore declared a mistrial; government's appeal of mistrial and suppression orders permitted); *United States v. Steed*, 674 F.2d 284 (4 Cir.) (in banc), *cert. denied*, 459 U.S. 829, 103 S.Ct. 67, 74 L.Ed.2d 68 (1982) (post-verdict judgment of acquittal appealable); *United*

*States v. Margiotta*, 662 F.2d 131 (2 Cir. 1981) (same as *Layton*).

 Examination of the purposes of § 3731 makes it even clearer that the statute permits appeal of this type of pretrial order. The Supreme Court has noted on more than one occasion that Congress' intent in enacting the current version of § 3731 was "to remove all statutory barriers to a criminal appeal taken by the Federal Government." *Arizona v. Manypenny*, 451 U.S. 232, 243 n. 18, 101 S.Ct. 1657, 1665 n. 18, 68 L.Ed.2d 58 (1981) (citing *United States v. Wilson*, 420 U.S. 332, 337, 95 S.Ct. 1013, 1019, 43 L.Ed.2d (1975)). Thus, the statute authorizes appeals by the government except when a retrial would be barred by the double jeopardy clause of the fifth amendment. *United States v. Steed*, 674 F.2d 284, 285 (4 Cir.) (in banc), *cert. denied*, 459 U.S. 829, 103 S.Ct. 67, 74 L.Ed.2d 68 (1982). Since the defendant himself moved for the mistrial in this case, the principles of double jeopardy do not bar his retrial. Moreover, in moving for a mistrial defendant specifically waived any double jeopardy claim that he might have on retrial. The waiver may not have explicitly referred to this appeal, but since this appeal is only barred if a retrial is also barred, the waiver necessarily eliminates the potential constitutional objection to this appeal. Defendant's argument that we lack jurisdiction over the instant appeal is therefore without merit.

### III. Voluntariness

Defendant's theory of his motion to suppress is that he was induced to confess by promises of lenient treatment and therefore his confession was involuntary. *See, e.g., Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976) (per curiam).

### A. The Proceedings Below

Agents Coront and Crawford, who participated in the arrest and transportation of defendant on August 14, Agent Boronyak and Inspector Reilly, the officers who took

defendant's statements on August 15, and the defendant all testified at the pretrial suppression hearing. There was no disagreement about the fact that defendant's *Miranda* rights had been fully respected, but there was a sharp disagreement between defendant and the agents over whether Reilly and Boronyak had promised defendant certain favors in return for his cooperation and statements. The district court relied on the defendant's perceptions of the events (although it admitted that "it is not wholly the Defendant's state of mind which controls"), and from this perspective, it found that "there was an implied promise [as to reduced criminal charges or release on his own recognizance] made to the Defendant to induce him to execute the written statement." The district court chose not to resolve the credibility dispute between the government agents and defendant; instead, it relied on the events of August 14 for its finding of an implied promise:

> I find as a fact that there had to have been some meaningful discussions between Coront, on the one hand, and the Defendant, on the other, which could have reasonably led him to the belief that he had in his hands a defendant who was willing to cooperate.
>
> I find that, therefore, there was a promise which vitiates the voluntariness of the confession and I will exclude from proof the written statement which was generated as a result of the occurrences of that day.
>
> I find further that on the facts I am persuaded that the discussion which was had between this defendant and the two Case Agents—I do not need to make a specific finding of credibility between Case Agent Riley [sic] and Agent—I do not have to make a specific finding as to

credibility in those cases—Boronyak—I think that the earlier promises are ones which lay the predicate for the misleading of this particular defendant and that he was relying on a continuation of his understanding of what had been promised him by Coront at the time when he was talked to about the bail which was set.

> The very fact that there is a formulation put on the record by Agent Coront about those conversations and the description given by Coront about the—that he thought he should not talk to somebody on the phone until he talked to the Case Agents because then word of his arrest would be on the street, this could only make sense if there was some understanding that there was to be cooperation and, therefore, I find that there is not a sufficient proof and the Government has not borne its burden by proving that this statement is, indeed, a voluntary statement.

We think that this conclusion, which rests on the events of August 14, is not supported by the law or the evidence in this case.

## B. The Legal Framework

■ The district court correctly cited *Hutto* for the proposition that a confession is involuntary if it is "extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the extension of any improper influence." *Id.* at 30, 97 S.Ct. at 203. Despite this broad language, the cases indicate that government agents may validly make some representations to a defendant or may discuss cooperation without rendering the resulting confession involuntary. Government agents may initiate conversations on cooperation,[2] they may promise to make a

---

**2.** *United States v. Williams,* 479 F.2d 1138, 1139–40 (4 Cir.), *cert. denied,* 414 U.S. 1025, 94 S.Ct. 452, 38 L.Ed.2d 317 (1973) (agent suggested that defendant "try to help himself"); *Rachlin v. United States,* 723 F.2d 1373, 1377–79 (8 Cir. 1983) (agents may have told defendant that it was in his best interest to cooperate, but resulting confession was offered merely in the hope of leniency, not in response to a promise of

leniency); *United States v. Vera,* 701 F.2d 1349, 1363–64 (11 Cir.1983) (agent told defendant that he could help himself out by cooperating); *United States v. Ballard,* 586 F.2d 1060, 1062–63 (5 Cir.1978) (defendant was informed of the maximum possible penalties and the likely sentence and promised that if she cooperated government would make a recommendation and inform the court of her cooperation); *United*

defendant's cooperation known to the prosecutor,[3] and they may even be able to make and breach certain promises without rendering a resulting confession involuntary.[4] Nevertheless, there are certain promises whose attraction renders a resulting confession involuntary if the promises are not kept, and the defendant's perception of what government agents have promised is an important factor in determining voluntariness.[5]

## C. The Testimony Below

■ Defendant's counsel argues that the defendant perceived a promise of leniency consisting of three discrete elements: (1) being able to keep his truck, (2) getting out on bail, and (3) pleading to a lesser charge. We consider each in turn.

The first element is wholly unsupported on this record. At the time defendant was arrested, the agents asked him whether he wanted his truck towed somewhere or whether he could have someone pick it up at the airport. Defendant was asked, "And you knew on the 14th, right after you were arrested, that you were going to get your truck back?" He answered, "Yes, I never denied that." The defendant even stated, "I discussed my truck with his partner. He wanted to know where I wanted it put ... what does that got to do with anything, my car?" And in response to the question whether anyone ever said "We'll give you your car back if you'll cooperate with us," defendant responded, "No, sir." Thus, the defendant specifically denied the existence of any express promises concerning his truck, and this record will not support any coercive implied promises.

As to the second element, defendant did claim that Coront discussed the need for a bail bondsman with him after his bail had been set. He testified that "the first mention of any deal whatsoever was when I didn't need to make a phone call. ... He said we have some people that would like to talk to you, you don't need to call a bondsman. Q. And he told you if you cooperated you wouldn't need to call a bondsman? A. Right." Coront denied discussing the need for a bail bondsman, but the district court's finding that Coront made an implied promise to the defendant

---

*States v. Pomares,* 499 F.2d 1220, 1222 (2 Cir.), *cert. denied,* 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974) (arresting agents told defendant that he was facing severe penalties, that he was his own best lawyer, and that full cooperation would be his best course of action).

**3.** In this case, the district court said: "I almost think that's a given." *See, e.g., United States v. Robinson,* 698 F.2d 448, 455 (D.C.Cir.1983); *United States v. Fera,* 616 F.2d 590, 594 (1 Cir.), *cert. denied,* 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980); *United States v. Curtis,* 562 F.2d 1153, 1154 (9 Cir.1977), *cert. denied,* 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978); *United States v. Glasgow,* 451 F.2d 557, 558 (9 Cir.1971).

**4.** In *United States v. Robinson,* 698 F.2d 448 (D.C.Cir.1983), the defendant claimed that his confession was involuntary because it had been elicited by "promises to inform the prosecutor of his cooperation and not to arrest and charge him that day." *Id.* at 455. The court held that, even though the arresting officer admitted both promises and that the second was broken upon his superior's orders, the promises were not sufficiently critical to render the confession involuntary. *Id.* In *United States v. Ferrara,* 377 F.2d 16 (2 Cir.), *cert. denied,* 389 U.S. 908, 88

S.Ct. 225, 19 L.Ed.2d 225 (1967), a "federal agent testified he had told [defendant] 'if he cooperated with the United States [Attorney] I felt sure he would get out on reduced bail.'" 377 F.2d at 17, but the court held that "the agent's comment was not the kind of inducement or promise that would, by itself, make the confession involuntary." *Id.* at 18. The court noted that the Supreme Court's "any direct or implied promises, however slight" language "has never been interpreted with the wooden literalness urged on us by [defendant]." *Id.* at 17.

**5.** In *Grades v. Boles,* 398 F.2d 409 (4 Cir.1968), we stated that discussions possibly amounting to promises of leniency or a plea bargain must be viewed from the defendant's, not the prosecutor's, perspective. *Id.* at 412. We also held that the defendant's reasonable perception that he had been promised that all charges on unrelated offenses would be dropped, a perceived promise that was not fulfilled, was the principal and determinative factor leading to his confession, which was therefore involuntary. In *Ferguson v. Boyd,* 566 F.2d 873 (4 Cir.1977), we stated that repeated conversations about releasing defendant's girlfriend if defendant cooperated could reasonably have caused defendant to believe that such a promise had been made to him. *Id.* at 876.

on August 14 is not clearly erroneous if it refers to this subject. However, even if this alleged promise on bail was made, it was not only performed but it was a promise which manifestly did not overbear defendant's will. Defendant was released on his own recognizance on August 15 but only after his bail had been set at the reasonable sum of $10,000 and defendant's brother (at defendant's request) had procured a bondsman to act as surety. Even if defendant did not know that his bail was assured, we do not think the amount of the bail was so great that a promise to forego security would have a coercive effect. *See* note 4 *supra.*

The only alleged promise of leniency that could possibly vitiate the voluntariness of defendant's statement concerns pleading to a lesser charge. The district court apparently erroneously relied on some statements by Coront to find an implied promise to defendant to accept a plea to a lesser charge. But the defendant's own testimony completely negates the making of any implied promises on this subject:

Q. And did that agent [Coront] say anything to you about pleading to a lesser sentence?

A. He didn't say anything to me.

Q. Did he tell you that if you cooperated he would bring it to the attention of the United States Attorney?

A. No, sir, that man [Coront] didn't tell me that.

\*　\*　\*　\*　\*　\*

That man right there [Reilly] did and the other man that left here [Boronyak].

They are the two agents that did all of the negotiations. This man [Coront] told me not to make no phone calls and not to let no one know that I was arrested, that he had two men in the department, Inspector Reilly and the other one, that

would like to talk to me, and that they could probably help me, you know.

On reexamination, defendant emphatically repeated that Coront did not promise him anything:

A. I told you exactly what his words were, "don't let anybody ..." "You're better off if you don't let anybody know you've been busted because we have some people that'd like to talk to you." Exact words. I've said 'em to you ten times today and they're not changing.

Q. Did he promise you if you did cooperate—

A. He didn't promise me anything. All he said is he had some people that he had, wanted to talk to me, which meant one thing to me, you know, so somebody wanted to talk to me to do some business with me. Would that mean that to you?

Q. But he didn't make any promises to you?

A. I never said he did. I told you exactly what the man said.

In light of this testimony, which substantially matched Coront's version,[6] there simply is no basis for concluding that any implied promises were made on August 14, let alone that they coerced the defendant.

Our conclusion does not necessarily mean that defendant's statements must be admitted or that a further hearing is required to determine their admissibility. The district court conducted a full evidentiary hearing on the matter, and we hold only that the statements may not be suppressed solely on the basis of the defendant's alleged perception of the events on August 14.

REVERSED.[7]

MURNAGHAN, Circuit Judge, dissenting:

When one shakes and turns a kaleidoscope, one sees a very different arrange-

---

6. Coront admitted that he interjected a suggestion about talking to the case agent when defendant requested to make a phone call, but he denied telling defendant that he would not need a bail bondsman and he denied making any promises at all to defendant. Crawford also denied hearing or making any promises to defendant.

7. Prior to argument of this appeal, defendant moved to dismiss the appeal for lack of jurisdiction on our part to entertain the appeal. We declined to rule on the motion before hearing the case. The motion is now denied.

ment, even though one is looking at the same things in combination. Because of what I perceive to be a failure to take into account the consequences of one important, and as it turns out, controlling difference in alignment between the authorities cited in the majority opinion and the procedural posture of Shears' case, I respectfully dissent.

The majority opinion painstakingly and convincingly amasses the authorities to demonstrate that if, in the present case the district judge, having carefully reviewed the totality of the circumstances, had decided that Shears' confession had been voluntary, it would be our duty to affirm. However, each of the cases cited involved an appeal from a trial court decision *in favor of* the government's claim that the confession was voluntary. A factor of substantial importance was, of course, the deference to be accorded the judgment of the district judge, who has the crucial opportunity to observe the way testimony is given. While that important factor assists a district judge in assessing credibility, it has an additional and here much more important function to play, namely, the evaluation of nuances of meaning. Words are often very

imprecise building blocks with which to convey meaning, and a district judge present at utterance is inescapably in a far superior position to decide what really was meant.

That has undoubtedly played a major role in all the cases cited by the majority. *E.g., United States v. Ballard,* 586 F.2d 1060, 1062–64 (5th Cir.1978). Yet, in the case of Shears, that consideration is not given the importance which properly attaches to it. Shears' case is one of the very few where an appeal was taken from the decision of the district judge, doing the difficult job assigned to him, that the confession should be suppressed. His decision should be upheld unless clearly erroneous. *See United States v. Lewis,* 528 F.2d 312 (4th Cir.1975).

A district judge must be allowed considerable scope in which to make the decisions which he reaches on what are quintessentially matters of fact.[8] Here we deal with such a case, and I am not left with a definite and firm conviction that a mistake has been committed.[9]

If the district judge had drawn from the facts before him a contrary conclusion con-

---

**8.** The requirement for an independent appellate review of the record on the issue of voluntariness, *(see Davis v. North Carolina,* 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764–65, 16 L.Ed.2d 895 (1966); *United States v. Robinson,* 698 F.2d 448 (D.C.Cir.1983)), is necessitated by a concern for protecting the due process rights of defendants. That consideration does not operate, however, when the shoe is on the other foot.

**9.** In *Jackson v. Denno,* 378 U.S. 368, 390–91, 84 S.Ct. 1774, 1788, 12 L.Ed.2d 908 (1964) the Supreme Court observed:

Expanded concepts of fairness in obtaining confessions have been accompanied by a correspondingly greater complexity in determining whether an accused's will has been overborne—facts are frequently disputed, questions of credibility are often crucial, and inferences to be drawn from established facts are often determinative. The overall determination of the voluntariness of a confession has thus become an exceedingly sensitive task.... Where pure factual considerations are an important ingredient, which is true in the usual case, appellate review in this Court is, as a practical matter, an inadequate substitute for a full and reliable determination of

the voluntariness issue in the trial court and the trial court's determination, *pro tanto,* takes on an increasing finality. The procedures used in the trial court to arrive at its conclusions on the coercion issue progressively take on added significance as the actual measure of the protection afforded a defendant under the Due Process Clause of the Fourteenth Amendment against the use of involuntary confessions.

(Citations omitted). *Cf. Anderson v. City of Bessemer,* —— U.S. ——, ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985):

If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous....

This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts....

(Citations omitted).

cerning the existence of an implied promise, I would not have any quarrel with a decision that the defendant's situation involved "a mere admonition to tell the truth," or simple "government cajoling," rather than the exaction of an involuntary confession. However, the district judge was justified in his determination that, given the actors in the vignette before him, the defendant reasonably could and, in fact, did conclude from the August 14, 1984 discussion with agent Coront, that a bargain, which included leniency, had already been worked out and would be performed by the United States so long as Shears kept his mouth shut and cooperated.

The majority's parsing of the alleged promise into three tidy component promises omits crucial testimony which supports the district court's finding that Shears' incriminating statement was induced by an implicit promise of leniency for cooperation. While Shears stated that he and Coront did not formally discuss an arranged plea to a lesser sentence, the testimony indicates that Shears was led along. He testified that agent Coront "said he had some people that would like to speak to me, you know, he had some people that would like to speak to me to do me some good. You understand, if I cooperate, do me some good." Explaining why Shears told his brother on August 14 to turn off his answering machine, Shears testified "what good would it do to let anyone know that I am arrested if I am supposed to be cooperating with the government ...?" These representative snippets lend credence to the district judge's observations (a) that Shears' testimony, combined with Coront's testimony and the totality of circumstances, made sense to him only "if there was some understanding that there was to be cooperation," and (b) that the understanding was a predicate which misled Shears into making a statement on August 15.[10] It must not be overlooked that, once the defendant asserts that a confession was coerced by a promise, the burden is upon the government to prove that the confession was, indeed, voluntary by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972); *United States v. Johnson*, 495 F.2d 378, 383 (4th Cir. 1974), *cert. denied*, 419 U.S. 860, 95 S.Ct. 111, 42 L.Ed.2d 95 (1974). Here, the district judge concluded that a promise was made and that the government's evidence on voluntariness did not persuade him by a preponderance.

Finally, it merits mention that this case was one in a thousand in its nature. Normally, when the judge's decision to suppress the confession is announced, trial of the case follows hard apace. As a consequence, a finding in favor of suppression is not often appealed by the government. I by no means suggest that the jurisdiction was lacking for such an appeal or that postponement of the trial since December 4, 1984 pending our decision was in any way incorrect. I simply sense injustice in denying to Shears the benefits of a district judge's finding when the "not clearly erroneous rule" has worked so often in favor of the government against other defendants.

Accordingly, in dissent, I express my conclusion that the district judge acted correctly in suppressing the confession and that we should affirm.

---

**10.** Much is made of Shears' protestations that no "promise" had been made on August 14. Words, however, can be imbued with different meanings depending on context and on the level of sophistication of those who employ them. The district judge, of course, was free to apply tools of the trade, listen between spoken words, and conclude that Shears had been led to believe an understanding was reached on August 14, even if Shears himself did not consider the understanding to be a "promise."