In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1369

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JACOB STADFELD,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 08-CR-138-BBC-2—**Barbara B. Crabb**, *Judge.*

ARGUED SEPTEMBER 22, 2011—DECIDED JULY 27, 2012

Before POSNER, FLAUM, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge.* Amos Mortier was a major marijuana distributer with a network of street-level sellers in and around Madison, Wisconsin. He disappeared in November 2004, and the Dane County District Attorney's Office opened a John Doe proceeding to determine whether a crime had been committed. Prosecutors subpoenaed Mortier's known drug associates to testify in the John Doe.

Jacob Stadfeld was one of those dealers and received a subpoena in December 2004. Rather than appear before the John Doe judge, assert his right to remain silent, and follow the steps necessary to obtain formal immunity, he opted to talk to investigators informally in exchange for an oral nonprosecution agreement from the state prosecutor. Stadfeld's retained counsel mistakenly advised him that this nonprosecution agreement immunized him against the use of his statements by *any* prosecutor's office—state *or* federal. Almost four years later, based in part on his statements to the John Doe investigators, Stadfeld was indicted by a federal grand jury for conspiracy to distribute marijuana.

He moved to suppress the use of his statements, arguing that he spoke to investigators only because he was under the mistaken impression that he had full immunity. The district court denied the motion, holding that although Stadfeld got bad advice from his attorneys, neither the police nor the prosecutor had misled him, so his statements were not involuntary. The court also held that regardless of any misunderstanding about the scope of the nonprosecution agreement, Stadfeld breached it by lying to the investigators. Stadfeld was convicted by a jury and now appeals, raising several claims of error, but focusing primarily on the admission of his statements at trial.

We affirm. The district court properly denied the suppression motion. Stadfeld's statements were not the product of law-enforcement coercion, and the erroneous advice from his lawyers did not make his statements

involuntary or inadmissible based on ineffective assistance of counsel. Moreover, to the extent that Stadfeld thought he had a comprehensive immunity agreement, it was conditioned on his telling the truth, and his failure to do so was a breach.

## I. Background

In November 2004, Mortier, a large-scale marijuana distributor, disappeared from his home in Fitchburg, Wisconsin, a small town just outside Madison. In response to his disappearance, the Dane County District Attorney's office opened a John Doe proceeding to investigate and determine whether a crime had been committed. *See generally* WIS. STAT. § 968.26. Prosecutors subpoenaed Mortier's known drug associates to testify in the John Doe. Some appeared before the John Doe judge, asserted their Fifth Amendment privilege against self-incrimination, and forced the prosecutor to ask the judge to convene as a court and grant formal immunity in order to compel their testimony. *See id.* §§ 968.26(3), 972.08(1); *State v. Washington,* 266 N.W.2d 597, 607-08 (Wis. 1978) (explaining the scope of the John Doe proceeding); *see also In re John Doe Proceeding,* 660 N.W.2d 260, 282-83 (Wis. 2003) (Sykes, J., dissenting) (explaining the limits on the John Doe judge's power). Stadfeld received a John Doe subpoena, but he did not follow that formal course. Instead, on the advice of his retained counsel, he agreed to talk to investigators informally.

In exchange for Stadfeld's informal cooperation, Assistant District Attorney Corey Stephan orally agreed not to

prosecute him based on any statements he made about his involvement in Mortier's drug-distribution network *provided* that he gave a complete and truthful statement to investigators. Stadfeld's attorneys erroneously told him that Stephan's nonprosecution promise gave him complete immunity—not just from state prosecution but from the use of his statements in *any* prosecution against him, state *or* federal.

Stadfeld thereafter met several times with John Doe investigators, including Detective Shannan Sheil-Morgan of the Fitchburg Police Department. He gave the investigators a series of conflicting statements about Mortier's drug-trafficking activities and his own role in the marijuana distribution network dating back to 2000. In 2008 the United States Attorney for the Western District of Wisconsin used Stadfeld's statements to indict him for conspiracy to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846. Stadfeld moved to dismiss, or alternatively, to suppress the use of his statements against him at trial. He claimed that the statements were involuntary because he mistakenly believed, based on the erroneous advice of his counsel, that he had full immunity when he talked to the John Doe investigators.

A magistrate judge heard evidence and recommended that the district court deny both motions. In his report and recommendation, the magistrate judge found that Stadfeld's statements had not been induced by any coercive conduct on the part of the state prosecutor or the John Doe investigators. He also noted that to the extent

Stadfeld relied on the mistaken advice of his counsel, he was not entitled to dismissal or suppression because he breached whatever immunity agreement he thought he had by lying to investigators in a number of material respects. The district court accepted the magistrate judge's recommendation and denied both motions.

Prior to trial Stadfeld moved to exclude any reference to Mortier's disappearance and the existence of the John Doe investigation, citing the possibility of inflammatory prejudice.[1] At the final pretrial hearing, however, Stadfeld's attorney withdrew the motion and asked the court to allow the admission of evidence of the John Doe on the theory that it was necessary to show the bias of several of the government's witnesses. In particular, Stadfeld wanted to argue that the alleged coconspirators falsely implicated him in the drug conspiracy to shift the focus off themselves in the John Doe. The court denied

---

[1] Mortier is still missing and presumed murdered. While Stadfeld was awaiting sentencing in this case, the government openly considered attempting to prove that Stadfeld was involved in Mortier's death for the purpose of establishing a factual basis for a murder enhancement under U.S.S.G. § 2D1.1(d)(1). *See* Government's Request To Continue Sentencing, *United States v. Stadfeld*, No. 08-CR-138-C (W.D. Wis. Nov. 3, 2010). The government ultimately decided not to seek the enhancement. *See* Notice of Government's Intent To Not Seek Enhancement, *United States v. Stadfeld*, No. 08-CR-138-C (W.D. Wis. Jan. 18, 2011); Government's Sentencing Memorandum, *United States v. Stadfeld*, No. 08-CR-138-C (W.D. Wis. Feb. 1, 2011).

this request. Later, however, the court accepted defense counsel's request to refer generically to the existence of "another investigation" or a "different investigation" when questioning the witnesses.

At trial the government called Detective Sheil-Morgan to testify about the interviews with Stadfeld. During cross-examination, Stadfeld's counsel asked the detective if she could produce her interview notes. She testified that the notes were probably destroyed after she filed her formal reports memorializing the interviews. Stadfeld's attorney asked the court to order Sheil-Morgan to produce her notes. The judge told the detective to look for her notes during a court recess, but later reversed course. The government objected to the defense demand for the notes, pointing out that Sheil-Morgan's written reports had been produced during discovery, and there was no reason to think there was any discrepancy between her formal reports and the notes. The court sustained the objection and denied Stadfeld's request for production of the detective's interview notes.

The jury found Stadfeld guilty of conspiracy to distribute 100 or more kilograms of marijuana. At sentencing the court accepted the government's position that the total drug quantity for the conspiracy was at least 2,177 kilograms of marijuana (about 100 pounds per month for 48 months) and attributed the entire amount to Stadfeld in light of his intimate knowledge of the conspiracy and willingness to join it. More specifically, the court found that Stadfeld was aware of the source of the drugs, the means of transportation, the drug-pack-

aging and delivery methods, the quantities customarily delivered, and the names of other marijuana distributors in the chain. The court's relevant-conduct finding yielded an advisory guidelines range of 168 to 210 months. The judge sentenced Stadfeld to 144 months. This appeal followed.

## II. Discussion

Stadfeld raises three claims of error. First, he argues that the district court should have suppressed his statements to the John Doe investigators. He also challenges the court's evidentiary rulings regarding Detective Sheil-Morgan's interview notes and the exclusion of the evidence of Mortier's disappearance and the existence of the John Doe investigation. Finally, he claims that the court erroneously held him responsible for the full amount of marijuana distributed by the conspiracy as jointly undertaken criminal activity for sentencing purposes.

## A. Stadfeld's Motion To Suppress

We review the denial of Stadfeld's motion to suppress under a dual standard of review: Factual findings are reviewed for clear error, with special deference to the district court's credibility determinations, and conclusions of law are reviewed de novo. *United States v. Villapando*, 588 F.3d 1124, 1127 (7th Cir. 2009). Stadfeld argues that his statements to the John Doe investigators were involuntary and should have been suppressed.

His basic contention is that but for the bad advice of his attorneys about the scope of the state nonprosecution agreement, he would not have spoken with the police.

A conviction obtained by the use of an involuntary confession violates due process. *United States v. Vallar*, 635 F.3d 271, 281 (7th Cir. 2011). A confession is voluntary and admissible if, "'in the totality of circumstances, it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" *Id.* at 282 (quoting *United States v. Gillaum*, 372 F.3d 848, 856 (7th Cir. 2004)). A false promise of lenience is "an example of forbidden [interrogation] tactics, for it would impede the suspect in making an informed choice as to whether he was better off confessing or clamming up." *United States v. Baldwin*, 60 F.3d 363, 365 (7th Cir. 1995).

An obvious flaw in Stadfeld's argument is that it rests on the mistaken advice of his lawyers, *not* coercive conduct by law-enforcement officers. "[C]oercive police activity is a necessary predicate to [a] finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment." *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001) (internal quotation marks omitted); *see also Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973). Even "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause." *Colorado v. Connelly*, 479 U.S. 157, 166 (1986). This principle is hornbook law:

> Coercive police activity is a necessary predicate to finding that a confession is not "voluntary" within the meaning of the Due Process Clause. Although a defendant's mental condition may be a significant factor in the "voluntariness calculus," this does not justify a conclusion that his mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional "voluntariness."

2A CHARLES ALAN WRIGHT & PETER J. HENNING, FEDERAL PRACTICE AND PROCEDURE § 414, at 162 (4th ed. 2009).

Simply put, there was no coercive police activity here. Neither the state prosecutor nor the John Doe investigators made any threats or false promises of leniency to obtain Stadfeld's statements. They did not resort to subterfuge or deceptive interrogation tactics to get him to talk. In exchange for a complete and truthful statement to the John Doe investigators, the state prosecutor promised not to prosecute Stadfeld but made no representations about a federal prosecution. The suggestion that the state prosecutor's oral nonprosecution agreement gave Stadfeld complete immunity—including immunity from *federal* prosecution—came from *his own lawyers*, not a government agent.

Stadfeld concedes the point and instead takes a different tack. Citing *United States v. Cahill*, 920 F.2d 421 (7th. Cir. 1990), and *United States v. Cichon*, 48 F.3d 269 (7th Cir. 1995), he argues that the government can be held to a promise of immunity it did not actually make—even absent official misconduct—if (1) the defendant genuinely

believed that the government made the promise; and (2) the belief was objectively reasonable. This is an extravagant misreading of *Cahill* and *Cichon*.

*Cahill* involved a prosecution for mail fraud, wire fraud, and several other federal offenses arising out of the collapse of a thrift-savings institution insured by the FDIC. 920 F.2d at 422-23. Federal regulators evaluating the collapse looked into the thrift's relationship with a mortgage company run by the defendant Cahill. *Id.* Although an Assistant United States Attorney initially assured Cahill that he was not the target of an ongoing criminal investigation, federal authorities eventually came to believe that Cahill was involved in the thrift's collapse. *Id.* at 423-24. The prosecutor told Cahill that immunity was not appropriate under the circumstances and suggested that if he wanted to cooperate, he could make a proffer. *Id.* at 424. Cahill agreed to do so and was later indicted. *Id.* He moved to suppress the use of his statements, insisting that he had been granted immunity, or alternatively, that his statements were involuntary because they were induced by a false promise of immunity. *Id.* at 425.

The district court rejected these arguments, crediting the Assistant U.S. Attorney's testimony that he never offered Cahill immunity. *Id.* at 426. We affirmed this fact-specific holding. *Id.* at 427. There was no evidence that Cahill had been granted immunity, nor any support for his claim that his statements were made under a "perception," wrongfully induced by the prosecutor, that he had been granted immunity. *Id.* On this latter point, we

observed that "[a] defendant's perception that he is providing testimony under a grant of immunity does not make his statement involuntary, unless the perception was reasonable." *Id.* (citing *United States v. Shears*, 762 F.2d 397, 401-03 (4th Cir. 1985)). To the extent that Cahill "perceived" that he had immunity, we held that "[the] perception was unreasonable." *Id.*

Stadfeld seems to think that *Cahill* stands for the proposition that a defendant's statement can be deemed involuntary and thus subject to suppression even in the absence of evidence of coercive tactics by law enforcement. Not true. To the contrary, *Cahill* relied on a Fourth Circuit decision that followed the norm of deciding a motion to suppress by asking whether the police engaged in coercive conduct to overcome the defendant's free will. *See Shears*, 762 F.2d at 402 ("[T]he defendant's perception of what government agents have promised is an important factor in determining voluntariness."). Nothing in *Cahill* signals any departure from well-established voluntariness doctrine.

Stadfeld also misunderstands *Cichon*. That case also involved a defendant's effort to suppress the use of his statements based on a claim that government agents falsely promised him immunity. 48 F.3d at 275-76. As in *Cahill*, the district court rejected the claim because it was factually unsupported, and we affirmed. *Id.* at 276 ("The district court also made it clear that it disbelieved Mr. Cichon's testimony that he was promised immunity."). Neither *Cichon* nor *Cahill* supports Stadfeld's argument that his statements can be deemed involuntary in the absence of coercive conduct by government agents.

In the alternative, Stadfeld argues that his statements to the John Doe investigators should have been suppressed under *Strickland v. Washington*, 466 U.S. 688 (1984), as the product of the ineffective assistance of his counsel. This argument overlooks the basic principle that a Sixth Amendment ineffective-assistance-of-counsel claim is viable only *after* the right to counsel attaches, which takes place "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972). Here, Stadfeld agreed to talk to the police informally, in lieu of appearing before the John Doe judge, long before the initiation of adversary judicial criminal proceedings.

A John Doe is a special investigative proceeding that developed as a feature in Wisconsin criminal law in the late nineteenth century under a statute that allowed a magistrate to examine witnesses under oath after receiving a complaint that a crime had been committed. *See Washington*, 266 N.W.2d at 603 (describing the statutory history). A John Doe is "not so much a procedure for the determination of probable cause as it is an inquest for the discovery of crime in which the judge has significant powers," including the ability to subpoena witnesses. *Id.* at 604. A John Doe proceeding does not begin the adversarial process against a criminal accused. Rather, the role of the John Doe is to gather evidence from witnesses in order to determine whether a criminal complaint should be filed or whether no crime was committed. *Id.* at 605. *See also In re John Doe Proceeding*, 660 N.W.2d at 275-76; *id.* at 286-87 (Sykes, J., dissenting)

(explaining the role and limits of a John Doe judge's power).

Accordingly, the John Doe investigation into Mortier's disappearance was not the beginning of the adversarial criminal process against Stadfeld. Although the John Doe statute permits witnesses to have counsel present during their testimony, the proceeding remains nonadversarial and counsel's role is strictly limited. *See* WIS. STAT. § 968.26(3) (stating that "counsel shall not be allowed to examine his or her client, cross-examine other witnesses, or argue before the judge"). Stadfeld's receipt of a John Doe subpoena did not trigger his Sixth Amendment right to counsel. Because his constitutional right to counsel had not attached when he gave his statements to investigators, there is no basis for a claim of ineffective assistance of counsel.

Finally, we agree with the district court that to whatever extent Stadfeld thought he had a comprehensive immunity agreement, it was conditional. Any reasonable belief in a promise of immunity vanished when he knowingly lied to investigators. Stadfeld was not entitled to the remedy of suppression.

## B. Stadfeld's Evidentiary Challenges

### 1. *Evidence of Mortier's Disappearance and the John Doe*

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Penaloza*, 648 F.3d 539, 544 (7th Cir. 2011). Stadfeld argues that the district court abused its discretion by refusing to allow any evidence

of Mortier's disappearance and the John Doe investigation. Although Stadfeld's attorneys initially moved to exclude this evidence, they later withdrew that motion and asked the court to allow it, arguing that the evidence was relevant to the credibility of the coconspirators who would be testifying against Stadfeld. Their theory was that the coconspirators had a motive to lie to deflect attention away from themselves in the John Doe.

Before addressing the merits of this argument, we note first that the government maintains that Stadfeld waived any objection to the court's ruling excluding this evidence. That is incorrect. Near the end of the final pretrial hearing, after the court had denied the motion to admit evidence of the John Doe, Stadfeld's attorney asked the court for permission to refer to "another investigation" when questioning the witnesses. The court agreed. This was not a waiver, as the government contends, but merely an adaptation to an adverse evidentiary ruling made by the district court. *Cf. Wilson v. Williams*, 182 F.3d 562, 564 (7th Cir. 1999) (en banc) (holding that adaptation to adverse ruling on motion in limine did not waive established objection).

On the merits, however, the district court's decision to exclude this evidence was entirely sound. Admitting evidence about Mortimer's disappearance and the John Doe would have taken the trial far afield from the charged crime involving the marijuana-trafficking conspiracy. Excluding this evidence did not seriously inhibit Stadfeld's ability to cross-examine the coconspirators to expose their self-interest. Counsel was permitted

to—and did—cross-examine the coconspirators based on their testimony in "another investigation" and used this line of inquiry to attack their credibility. The district court did not abuse its discretion in excluding this evidence.

### 2. *Request To Inspect Detective Sheil-Morgan's Interview Notes*

Stadfeld contends that his inability to obtain Detective Sheil-Morgan's interview notes prevented him from attacking her credibility and deprived him of important information about what was said during the police interviews. He has not identified any reason to suspect that the detective's interview notes are inconsistent with her written reports. Nor does he cite any legal authority—no evidentiary rule, no discovery rule, no case—to support this claim of error. Undeveloped arguments are considered waived. *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) ("[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver." (quotation marks omitted)).

### C. Relevant-Conduct Findings

Finally, Stadfeld challenges the district court's fact-finding regarding the scope of his jointly undertaken criminal activity for purposes of estimating drug quantity at sentencing. We review the district court's sentencing findings for clear error. *United States v. Edwards*, 115 F.3d

1322, 1325 (7th Cir. 1997). A factual finding is clearly erroneous when the court "is left 'with a definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. Herrera*, 54 F.3d 348, 356 (7th Cir. 1995)). "'[I]f two permissible views exist, the fact-finder's choice between them cannot be clearly erroneous.'" *United States v. Taylor*, 72 F.3d 533, 546 (7th Cir. 1995) (quoting *United States v. McDonald*, 22 F.3d 139, 144 (7th Cir. 1994)).

To determine drug quantity for purposes of relevant-conduct analysis in a conspiracy case, the district court must first determine the scope of the criminal activity the defendant agreed to jointly undertake. *See* U.S.S.G. § 1B1.3(a)(1)(B); *United States v. Salem* (*Salem I*), 597 F.3d 877, 886 (7th Cir. 2010). We have said that several factors are relevant: (1) the existence of a single scheme; (2) similarities in modus operandi; (3) coordination of activities among schemers; (4) pooling of resources or profits; (5) knowledge of the details of the scheme; and (6) length and degree of the defendant's participation in the scheme. *United States v. Salem* (*Salem II*), 657 F.3d 560, 564 (7th Cir. 2011).[2]

---

[2] The district court's assessment of these factors is not the end of the relevant-conduct analysis. After determining the scope of jointly undertaken criminal activity, "the court must make a two-part determination of whether the conduct of others was *both* in furtherance of that joint criminal activity *and* reasonably foreseeable to the defendant in connection with the joint criminal activity." *United States v. Salem* (*Salem I*), 597 F.3d 877, 886 (7th Cir. 2010) (citing *United States v. Fox*, 548 F.3d

(continued...)

Here, the district court first determined that the scope of Stadfeld's jointly undertaken criminal activity included the regular receipt by the Mortier organization of large deliveries of marijuana—about 100 pounds per month— from Canada through New York for distribution in and around Madison. The court also determined that the marijuana typically arrived in Madison in private cars, was generally offloaded at Mortier's residence, and then fronted to lower-level dealers like Stadfeld for further distribution. The court found that Stadfeld was aware of the specific details of the conspiracy and its method of operation, including the source of the drugs, the methods of packaging and delivery, delivery quantities, and the names of other street-level marijuana distributors supplied by Mortier.

Stadfeld argues that these findings are insufficiently particularized to support the court's determination that the scope of the criminal activity he jointly agreed to undertake was coextensive with the entire marijuana-

---

[2] (...continued)
523, 532 (7th Cir. 2008)). The sentencing guidelines provide that a defendant is accountable for the jointly undertaken criminal conduct of others, provided the conduct is: (1) in furtherance of the jointly undertaken criminal activity; and (2) is reasonably foreseeable in connection with that criminal activity. U.S.S.G. § 1B1.3 cmt. n.2. Here, Stadfeld argues only that the district court failed to make sufficiently particularized findings regarding the scope of his jointly undertaken agreement. He does not challenge the other steps in the court's analysis.

trafficking conspiracy during the relevant time period. We disagree. The court's findings, though not accompanied by lengthy analysis, were easily sufficient and basically tracked the knowledge and modus operandi factors identified in our decision in *Salem II*. The district court also observed as a more general matter that the evidence at trial supported the existence of a single scheme and demonstrated substantial coordination of activities by and among the coconspirators, including Stadfeld. *See id.* Finally, the court noted that Stadfeld was involved in the conspiracy for more than four years—from 2000 to 2004—easily long enough to support the conclusion that he "agreed to advance the goals of the entire scheme and [is] thus accountable for jointly undertaken activity." *Id.* at 565. The district court's findings regarding the scope of Stadfeld's jointly undertaken criminal activity were not clearly erroneous.

AFFIRMED.