# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: SEPTEMBER 24, 2015
NOT TO BE PUBLISHED

**Supreme Court of Kentucky**

2014-SC-000140-MR

FINAL

DATE 10-15-15 Elizabeth Crowe Pc.

AARON RASHAD CAMPBELL                                    APPELLANT


ON APPEAL FROM FAYETTE CIRCUIT COURT
V.          HONORABLE PAMELA GOODWINE, JUDGE
NO. 10-CR-01585-001


COMMONWEALTH OF KENTUCKY                                 APPELLEE


AND                   2014-SC-000360-TG


AARON RASHAD CAMPBELL                                    APPELLANT


ON TRANSFER FROM COURT OF APPEALS
V.               CASE NO. 2014-CA-000482-MR
FAYETTE CIRCUIT COURT NO. 11-CR-00639


COMMONWEALTH OF KENTUCKY                                 APPELLEE


**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

Aaron Rashad Campbell conditionally pled guilty in two separate but

related robbery prosecutions.[1] Both prosecutions were for first-degree robbery

of the same victim, separated in time by a number of months. Under the terms

of his guilty plea, Campbell now challenges the trial court's denial of his motion

---

[1] 10-CR-01585-001: the "2010 robbery"; and 11-CR-00 639: the "2009 robbery."

to suppress his confessions in both prosecutions.[2] Campbell's sole argument is that repeated implicit promises of leniency during interrogation overbore his will, essentially coercing his confession. We disagree and find Campbell was neither promised leniency nor was his will overborne by police conduct. Campbell's convictions and related sentences, therefore, are affirmed.

## I.   FACTUAL AND PROCEDURAL BACKGROUND.

In August 2009, intruders entered David Norris's home, tied him up, hit him in the head, and robbed him of $70,000. A police investigation failed to produce any suspects for over a year.

Norris was robbed at home again in October 2010. This time, two men entered his home, tied him up, and made off with his credit card. Police began another investigation, aided in this instance by surveillance videos of individuals using credit cards at local stores and by Crimestoppers. Within a short time, Michael Washington emerged as a suspect.

Washington eventually confessed to the crime and implicated Campbell, his cousin, as the other participant. After arresting Campbell, police questioned him about the robbery multiple times. Ultimately, Campbell confessed to being involved. In light of the information gained from Campbell's statement, police became suspicious that Washington and Campbell were

---

[2] Given the length of Campbell's sentence for the 2010 robbery, he appeals as a matter of right. *See* Ky.Const. § 110(2)(b). Campbell's appeal for the 2009 robbery does not meet the requirements of § 110(2)(b) but was consolidated with the 2010 robbery appeal due to the extent of overlapping facts and arguments.

2

involved in the earlier robbery of Norris's home. Forensic evidence verified this suspicion. Campbell eventually confessed to the second robbery, as well.

Campbell was separately indicted for each robbery of Norris's home. Before trial, Campbell filed a motion to suppress both of his confessions on grounds that police made promises of leniency and coerced him into confessing. The trial court denied Campbell's motions following a hearing. As a result, Campbell entered a conditional guilty plea, reserving the right to appeal the trial court's decision. For the 2010 robbery, Campbell pleaded guilty to second-degree robbery and was sentenced to ten years' imprisonment. And for the 2009 robbery, Campbell pleaded guilty to first-degree robbery and being a second-degree Persistent Felony Offender (PFO 2) and, accordingly, was sentenced to twenty years' imprisonment. Campbell's sentences were ordered to run consecutively. The only issue now on appeal for our review is the trial court's denial of Campbell's suppression motion.

## II. ANALYSIS.

Appellate review of trial court rulings on motions to suppress is two-pronged: (1) Any factual findings by the trial court are conclusive as long as they are supported by substantial evidence; and (2) The application of the law to those facts, however, is reviewed de novo.[3]

The fundamental concern for affording a defendant due process mandates that confessions or other statements procured through coercive means be excluded. Generally speaking, a defendant's speech is tainted with

---

[3] *See Ornelas v. United States*, 517 U.S. 690, 691 (1996).

3

coercion when his "will has been overborne and his capacity for self-determination critically impaired . . . ."[4] A statement is admissible, in other words, when that statement was made voluntarily, *i.e.*, "the product of an essentially free and unconstrained choice by its maker".[5] When reviewing an allegedly coerced confession, we attempt to answer three points: "(1) whether the police activity was 'objectively coercive'; (2) whether the coercion overbore the will of the defendant; and (3) whether the defendant showed that the coercive police activity was the 'crucial motivating factor' behind the defendant's confession."[6] The totality of the circumstances, including "the characteristics of the accused and the details of the interrogation[,]"[7] aid us in this analysis.

The coercion Campbell alleges today is not of the physical variety. Campbell was not mistreated, abused, denied food or rest, or mishandled in any way. Of course, "coercion can be mental as well as physical . . . ."[8] After all, the "blood of the accused is not the only hallmark of an unconstitutional inquisition."[9]

It is acceptable for police to use a certain degree of psychological tactics in obtaining a suspect's confession. Various courts, including the United

---

[4] *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973).

[5] *Bailey v. Commonwealth*, 194 S.W.3d 296, 300 (Ky. 2006) (quoting *Schneckloth*, 412 U.S. at 225).

[6] *Id.* at 301 (quoting *Henson v. Commonwealth*, 20 S.W.3d 466, 469 (Ky. 1999)).

[7] *Schneckloth*, 412 U.S. at 226.

[8] *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960).

[9] *Id.*

4

States Supreme Court, have allowed police to "play on the suspect's sympathies or explain that honesty might be the best policy for a criminal who hopes for leniency from the state[.]"[10] This Court has, for example, permitted police to engage in strategic deception by misrepresenting the strength of the evidence against the suspect.[11] Promises, whether of leniency or otherwise, bring about somewhat special concerns with regard to a voluntary confession. That said, courts are in agreement that police "may validly make some representations to a defendant or may discuss cooperation without rendering the resulting confession involuntary."[12] More specifically, courts have permitted police to "initiate conversations on cooperation, . . . promise to make a defendant's cooperation known to the prosecutor, and . . . even be able to make and breach certain promises without rendering a resulting confession involuntary."[13]

Campbell alleges that his mental will was overborne as a result of the police's repeated promises of leniency in exchange for his confession and threats of increased punishment if he did not confess. Campbell also alleges he was coerced because the police threatened his girlfriend. We find Campbell's arguments meritless.

---

[10] *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986) (compiling cases).

[11] *Springer v. Commonwealth*, 998 S.W.2d 439 (Ky. 1999).

[12] *United States v. Shears*, 762 F.2d 397, 401-02 (4th Cir. 1985) (compiling cases).

[13] *Id.* (compiling cases).

Campbell's interrogations and related discussions with police were calm affairs with neither Campbell nor police ever becoming agitated. The interrogations were conducted in a casual manner with routine breaks. Campbell was permitted to smoke cigarettes, drink sodas, and contact family members. In fact, at one point, Campbell *thanked* police for being so kind to him.

Before reviewing the respective interrogations, it is important to mention that Campbell was given *Miranda*[14] warnings at the beginning of both interrogations and acknowledged he understood those rights. The common *Miranda* recitation warns the defendant that anything he says can and will be used against him. As a result, Campbell entered the interrogation with the knowledge that if he confessed to the robberies, he could be prosecuted. In order for Campbell's confessions to be rendered involuntary, the friendly demeanor and supposed promises by police would have to overcome Campbell's belief that the Commonwealth intended to prosecute him and sentence him to jail, if convicted.

Police first met with Campbell in November 2010 following his arrest. The focus of this interrogation was the 2010 robbery. During this interrogation, the police continually emphasized that they were not talking with Campbell to determine what happened; rather, they wanted to know why Campbell had robbed Norris. Consistent with this mission, police requested Campbell unburden himself and try to provide context to the robberies

---

[14] *Miranda v. Arizona*, 384 U.S. 436 (1966).

because, on their face, they looked bad. The police acknowledged that prosecutors often ask questions such as: "What was he like?"; "Was he remorseful?"; "Was he honest?"; or "Did he seem like he cared?" Police reminded Campbell they needed him to be honest with them about why the robbery occurred so they could answer those questions. Throughout the interrogation, police reminded Campbell that his best bargaining chip was his honesty and being completely honest would look better than lying.

Campbell expressed concern for Michael and sought a deal for him because Campbell felt as if Michael's participation was his fault. Police reminded Campbell that Michael had already provided a statement and his statement aligned neatly with the forensic evidence. Police then counseled that if his statement differed, he or Michael must be lying and that would mean no deal. The overall tone of the interrogations was far short of coercion.

At some point before Campbell's pretrial hearing for the 2010 robberies, he cut his ankle monitor and fled. Campbell was eventually apprehended by U. S. Marshals in April 2011 at his girlfriend's house.[15] Following his arrest,

---

[15] Campbell was arrested in his girlfriend's apartment while she was home. After he was handcuffed, the U. S. Marshals took Campbell's girlfriend into a nearby bedroom, shut the door, and proceeded to have a conversation with her regarding Campbell and her culpability for harboring a fugitive. The evidence is unclear whether Campbell heard this conversation. He argues on appeal that the police were objectively coercive in taking his girlfriend behind closed doors and "threatening" her with prosecution if she did not disclose information. This argument is baseless. There was no threat—Campbell's girlfriend certainly could have been prosecuted for harboring a fugitive. After all, Campbell was arrested in her home. Regardless, Campbell is unable to present evidence that he heard the conversation or that it had any impact on his decision to confess to police.

The same can be said for Campbell's argument regarding his nephew's mother. Apparently, police were quite rude to her when they arrived at her home

Campbell requested to talk with the detectives he had spoken with previously. This time, Campbell wished to speak about the 2009 robbery. The following exchange, in our view, dispels any notion that the interrogation was conducted in an objectively coercive manner:

> Campbell: Let me ask you a question. If I tell you, how are you going to be able to help me out?
>
> Detective: I'll be honest with you, I can't make you any promises saying I'll get you this . . . . I don't mind, the way I'm working is if you're . . . .
>
> Campbell: I'm not worried about calling a lawyer. I'm not worried about that . . . .
>
> Detective: The way I work is if you're totally honest with me and you lay it all out on the table and you give me everything, I have no problem going to bat for you. You're a young guy . . . you're a nice guy, Aaron and you've made some mistakes. And that's all they are—mistakes. . . . You're not a bad guy. You made a mistake.
>
> Campbell: I'm not gonna bullshit you. Only thing I'm afraid of is, say I tell you and nothing happens for me.

This is how the second interrogation began. Campbell set the tone early that he wanted something in return for any potential confession. No promises were made to him. In fact, the police explicitly acknowledged no promises *could* be made. We fail to see any coercion with regard to Campbell's interrogation relating to the 2009 robbery.

---

looking for Campbell and were quick to remind her that she could be prosecuted for harboring a fugitive if she was not truthful about his whereabouts. Campbell was not in the home at this point, so we are unsure how this interaction had any bearing on Campbell's decision to confess.

At what point promises of leniency, implied or explicit, reach coercion is an interesting question—a question the Supreme Court has offered somewhat mixed[16] guidance on over time. It is a question, however, that we need not answer to find Campbell voluntarily decided to confess. Police offered to assist Campbell, do everything in their power, or talk to the prosecutor on his behalf; but, for the majority of his discussions with police, Campbell was in control. Campbell actively bargained with police, seeking leniency for his cousin, help with lowering his bail, and participation in the home incarceration program.[17] Having an informed and candid conversation with police about future punishment hardly seems like the conduct of an individual whose will has been overborne.

---

[16] *See Bram v. United States*, 168 U.S. 532, 557-58 (1897) (holding promises of leniency or police comments intended to instill hope of leniency constitute coercion: "In this court the general rule that the confession must be free and voluntary—that is, not produced by inducements engendering either hope or fear—is settled by the authorities referred to at the outset."); *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (applying *Bram* in plea bargain context); *but see Arizona v. Fulminate*, 499 U.S. 279, 285 (1991) (distinguishing *Bram* because it "does not state the standard for determining the voluntariness of a confession . . . .")

[17] These questions indicate Campbell's knowledge and experience with the criminal justice system. The trial court took this into consideration when denying Campbell's motion to suppress. On appeal, Campbell mentions that this was improper. But the citation provided by Campbell provides little support for his position. To the contrary, it seems the case law supports the trial court's position. After all, the totality of the circumstances includes a review of the accused, as well as the various aspects of interrogation. Various courts have explicitly acknowledged—some even stressed the importance of—the role a defendant's prior experience plays in assessing whether a confession was voluntary. *See, e.g.*, *Stein v. New York*, 346 U.S. 156, 185 (1953) ("The limits [of permissible questioning tactics] in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person confessing. What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal.") *overruled on other grounds by Jackson v. Denno*, 378 U.S. 368 (1964); *United States v. Oglesby*, 764 F.2d 1273, 1278 (7th Cir. 1985).

Receiving something in return for a confession was not a concept injected into the situation by police, at least not solely. And police stopped short of ever truly promising Campbell anything, outside of simply offering to talk to the prosecutor and present Campbell's side of the situation. There was no guarantee of leniency, and we are unconvinced Campbell believed leniency was forthcoming. In any event, Campbell fails to offer any indication that his hopes of leniency served as a "crucial motivating factor"[18] in his decision to confess. While we can never be certain of a defendant's subjective motivations to confess, a review of the evidence indicates it is more plausible that Campbell confessed because he wanted to protect his cousin and he was remorseful for the troubles he was putting his family through. In the end, it may be fair to say Campbell's confession was made in the hope of leniency; but we cannot say from our review of this record that Campbell confessed in response to any promise of leniency.[19]

Police comments to Campbell most likely served as an impetus for him to come clean about the robberies. But we simply are unable to hold that the police's "non-answers," as Campbell labels them, exerted enough psychological pressure to overcome the "will of a mature, experienced man, who was suffering from no mental or physical illness"[20] and was not interrogated for an unreasonable time or in an unreasonable manner.

---

[18] *Bailey*, 194 S.W.3d at 301.

[19] *Miller*, 796 F.2d at 610.

[20] *Id.* at 613.

10

## III. CONCLUSION.

Because Campbell's will was not overborne during his various discussions with police, the trial court did not err in denying Campbell's motion to suppress. We affirm the judgment.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Julia Karol Pearson
Kathleen Kallaher Schmidt
Assistant Public Advocates


COUNSEL FOR APPELLEE:

Jack Conway
Attorney General of Kentucky

Heather Michelle Fryman
Assistant Attorney General